Filed 10/20/20  P. v. Byrnes CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| THE PEOPLE, | C088750 |
| Plaintiff and Respondent, | (Super. Ct. No. F17-000099) |
| v. | |
| KENNETH ALAN BYRNES, | |
| Defendant and Appellant. | |

A jury found defendant Kenneth Alan Byrnes guilty of continuous sexual abuse of a child under 14, and he was sentenced to a 12-year term.  On appeal, defendant contends his trial counsel rendered ineffective assistance by eliciting testimony from an expert regarding the very low rate at which false molestation allegations occur.  He also contends the trial court erred in instructing the jury on the use of circumstantial evidence using CALCRIM No. 225 rather than CALCRIM No. 224.  We affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with continuous sexual abuse of the victim, his adopted daughter. He previously had been convicted of sexually abusing another of his adopted daughters, the victim's younger sister. Evidence of that abuse was admitted under Evidence Code section 1108.

A. *The charged conduct*

The victim testified to having "three clear, distinct memories" of sexual abuse.[1] The first was in the upstairs bathroom, when defendant rubbed her vagina in the bathtub. She was then around six years old.

The second occurred when she went into her parent's room after a bad dream. She went to her dad's side of the bed. Defendant reached into her underwear and touched her vagina while she stood by the side of his bed.

The third took place more than a year after the second. The victim was watching television with defendant on the couch in the downstairs living room. Defendant pulled down his pants and had the victim touch his penis for approximately 30 minutes.

The victim did not tell her mother about these incidents of abuse. But when her younger sister was around 15, the victim learned that defendant had been arrested for molesting the younger sister. The mother responded by asserting that the younger sister was lying and seeking attention.

When the victim was pregnant with her first child, she felt there "was a huge part of [her] life that [she] had never shared with" her husband, so she informed him in a letter that she "remember[ed] some stuff with [her] dad." The victim eventually made a more fulsome disclosure after another sister of hers, who was living with defendant and their mother, became pregnant and told the victim that she hoped to have defendant and the

---

[1] As to her memory of her childhood, she testified, "I don't know if it's normal, but I have like vivid memories of my childhood and whole portions I don't even remember."

2

mother act as caretakers for the infant. The victim testified, "My gut just sank. I felt like if another child was hurt because of this that it would be guilt on my hands because I'd never come forward with the full truth of what happened and what a predator he was."

The victim made a report to the sheriff's office. With law enforcement, she later placed a pretext call with defendant. When confronted on the call, defendant screamed, "This is a lie from the pits of hell."[2]

An investigating officer spoke with defendant about the victim's allegation. Defendant denied the victim's allegations but admitted responsibility for abusing the younger sister. Asked why he had had inappropriate relations with the younger sister and not any of the other children, defendant said he had shared several interests with the younger sister such as working on cars and gardening.

Defendant speculated that the current victim's "false" allegations stemmed from postpartum depression.

B.    *The propensity evidence*

The victim's younger sister testified that her earliest memory of her father was a sexual one.[3] When she was three or four, defendant was lying on his back, exposed himself to her, and had her rub his genitals.

She testified that there were many incidents, stating she thought they occurred "multiple times a week." But when defendant's wife would go on extended trips, she explained that defendant "would take [her] into their room and then [she] would kind of stay there for a few days."

---

[2]    When the younger sister placed a pretext call to defendant, defendant admitted his molestation of the younger sister.

[3]    The younger sister explained, "Time is a little bit of a blur for me. We didn't really have a set schedule for school so we did school all year round . . . . "

She recalled incidents where defendant put his penis in her mouth, incidents where he put his fingers and mouth on her vagina and breasts, and incidents where he would make her rub his penis.

One of the last incidents, if not the last, occurred on Father's Day. She was around 12 and she and defendant went upstairs. Defendant gave her a bottle of lotion and had her "basically jack him off." She started crying uncontrollably and said, "I don't want to do this any more." Defendant started humming to himself and said, "Happy Father's Day to me."

When she was 15, she disclosed to a camp counselor at a religious camp in Chico, California, before sharing the details with a child protective services agent.

Neither the younger sister nor the victim have a current relationship with their mother.[4]

C.      *Jury verdict and sentencing*

The jury found defendant guilty of continuous sexual abuse of a child under 14. (Pen. Code, § 288.5, subd. (a).) The trial court denied probation and imposed a 12-year middle term.

## DISCUSSION

## I

*Child Sexual Abuse Accommodation Syndrome Testimony*

Defendant first contends that his trial counsel rendered ineffective assistance when she violated the court's ruling barring an expert on child sexual abuse accommodation syndrome (CSAAS) from testifying about the low rate of false allegations by child sexual abuse victims. We find no error.

---

[4]      The mother similarly testified the victim, along with the rest of her children, have ended their relationships with her.

A. *Additional background*

Following the victim's testimony, the trial court allowed the prosecution to present expert testimony on CSAAS, but only pertaining to delayed reporting and continued association with the alleged molester. In a written ruling regarding expert testimony, the court prohibited the expert "from testifying about any studies regarding percentages of false allegations of molest[ation], or percentages regarding children who are sexually abused that delay reporting."

Defense counsel had taken the position that CSAAS testimony was a waste of time, stating, "I think [the expert] is testifying about things the jury already knows. I think it's not good science and it's outdated given the age of the report."

The expert testified on direct examination within the scope of the trial court's order. On cross-examination, however, defense counsel asked about studies of people who make false allegations and how those people behaved. The expert answered, "There are a number of studies of false allegations of sexual abuse." Counsel persisted, inquiring about the "the hallmarks of false allegations." The expert hesitated, but ultimately explained, "Of the situations where a false allegation of sexual abuse occurs there are a couple of things that we know. One, false allegations of sexual abuse do occur. Two, they occur very infrequently or rarely and, three, probably the most common situation where false allegations occur . . . [is] where there has been some type of custody dispute between a husband and wife."

Counsel then asked clarifying questions: "A custody dispute or some other kind of quarrel or ax to grind. Would that be fair to say?" "The research points to some type of custody dispute," the expert answered, adding, "It's made by somebody, but not usually the child."

Defense counsel went on: "So you are referencing a study that says that false allegations are very rare and that generally it involves a custody dispute? Is that right?"

5

The expert replied, "The largest subgroup when a false allegation is made is one that usually involves some type of custodial dispute."

Counsel continued: "A fairly small sample size, wouldn't it be, since you say that false allegations are quite rare?" The expert explained, "I think the overall number of cases where the allegation was made was about 700. The number where a false allegation of sexual abuse—the number was identified about four percent of those 700 cases investigated or looked at."

When counsel asked if the expert had read more than one such study, the expert answered, "I have read several studies. All together there are about roughly about a dozen studies, empirical studies on false allegations of sexual abuse. The numbers are roughly the same, a little bit higher, a little bit lower."

Asked if he had worked with people who had made false allegations, the expert testified, "In my career I have had two cases that I am aware of where a false allegation of sexual abuse was made." Asked if those cases involved "pretty iron clad evidence that it was false," the expert answered, "I was comfortable with the information that I had that led me to come to the conclusion that the child had made a false allegation."

Counsel then asked, "Have you ever had a situation where you believed that an allegation was false when you did not have that kind of iron clad evidence of the accused's innocence?" The expert answered, "I am sure that I have, but I would be hard pressed to be able to give you an example at the moment." He later elaborated, "I may have some thought in my head about whether the allegation was true or not, my opinion as a therapist or as an evaluator doesn't really matter a lot. My job is to deal with mental health problems the kids have. So I may have some doubt about whether they are telling the truth or whether they really were abused or weren't abused, but my job is to deal with mental health problems, not to make some determination about abuse."

B.    *Analysis*

Defendant contends his trial counsel's elicitation of testimony that only four percent of child sexual assault victims make false allegations constituted ineffective assistance of counsel.  He cites case law finding such testimony inadmissible[5] and argues he was entitled to have the jury evaluate the victim's credibility without statistical evidence placing a thumb on the scale.  He also maintains that no possible reason could justify his counsel's repeated invitation to tell the jury that victims rarely lie about sexual assault.  We disagree.

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694 [80 L.Ed.2d 674, 693-694, 697-698]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.)

" 'Surmounting *Strickland*'s high bar is never an easy task.'  [Citation.]" (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642].)  "It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' [Citations.]  The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.  [Citation.]"  (*Ibid*.)  "When a defendant on appeal makes a claim that his counsel was ineffective, the appellate court must consider whether the record contains any explanation for the challenged aspects of the representation

---

[5]    Defendant cites *People v. Julian* (2019) 34 Cal.App.5th 878, 886 (the expert's "probability evidence invited jurors to presume [defendant] was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case") and *People v. Wilson* (2019) 33 Cal.App.5th 559, 571 ("The jury must evaluate their testimony, together with all the other evidence, to decide this question, and it should do so without statistical evidence placing a thumb on the scale for guilt").

provided by counsel. 'If the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," [citation], the contention must be rejected.' [Citation.]" (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1058.)

Here, an explanation for counsel's actions is readily apparent. The defense faced an uphill battle. The primary defense theory was that the victim was lying. But defendant had not only been credibly accused of molesting one adopted daughter, he indisputably had molested another. Given this posture, counsel could reasonably have concluded that the value of having an expert tell the jury that false accusations *do* occur outweighed the detriment of having the jury learn how rare false claims are. Indeed, the statistical evidence elicited on cross-examination of the expert was less harmful to the defense than the propensity evidence. The elicitation also allowed counsel to suggest to the jury that false accusations could arise from family quarrels—of which there was some evidence here—as well as the fact that even an expert cannot always tell whether an accusation is true or false.

Defendant has failed to meet his burden of establishing, on the record before us, that his trial counsel was ineffective. Although reasonable minds could differ about the efficacy of counsel's legal strategy, given the circumstances, we cannot conclude that trial counsel's representation fell below an objective standard of reasonableness under prevailing professional norms.[6]

---

[6]     In his reply brief, defendant argues his counsel "could have (and did)" establish allegations could be false by asking about the McMartin Preschool case, which involved a group of preschoolers who made false allegations. The record does not bear that out. Defense counsel asked about the McMartin case, but the expert ultimately testified that the value of the McMartin case is that it led to the development, over a quarter century, of "very good" interview protocols for children.

We find no ineffective assistance.

## II

### *Instructional Error*

Defendant next contends the trial court erred in failing to instruct the jury with CALCRIM No. 224,[7] which pertains to the use of circumstantial evidence. Instead, the jury was instructed with the more circumscribed CALCRIM No. 225.[8] Both instructions tell the jury how circumstantial evidence may be used, but CALCRIM No. 225 is used when intent or mental state " 'is the only element of the offense that rests substantially or

---

[7]    CALCRIM No. 224 states: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

[8]    CALCRIM No. 225 states: The People must prove not only that the defendant did the act[s] charged, but also that (he/she) acted with a particular (intent/ [and/or] mental state). The instruction for (the/each) crime [and allegation] explains the (intent/ [and/or] mental state) required. [¶] A[n] (intent/ [and/or] mental state) may be proved by circumstantial evidence. [¶] Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to conclude that the defendant had the required (intent/ [and/or] mental state), you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required (intent/ [and/or] mental state). If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required (intent/ [and/or] mental state) and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required (intent/ [and/or] mental state) was not proved by the circumstantial evidence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable.

entirely on circumstantial evidence.' " (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1171.)

We conclude the jury was properly instructed.

A.    *Additional background*

Prior to jury instruction, the prosecution proposed instructing the jury with CALCRIM No. 224. The trial court noted that CALCRIM No. 225 is given "if intent is the only element that may be proved by circumstantial evidence," and CALCRIM No. 224 is given where elements other than intent are also proved by circumstantial evidence.

The defense argued for CALCRIM No 225 "because [the circumstantial evidence] seemed to go to a specific intent crime." The court asked if any element, other than specific intent, was being proved by circumstantial evidence. The prosecutor responded, "Well, yes. The act itself."

Defense counsel responded that while circumstantial evidence was offered to establish intent, such evidence was not offered to establish the acts, stating, "If a witness comes in and says, 'This happened to me,' that is not circumstantial evidence. It kind of sounds to me like 225 is the better way to go." The court responded, "I agree with you based on that same analysis."

The prosecutor cautioned that propensity evidence of defendant's prior was circumstantial evidence of the current charged act. The court sided with defense counsel, stating, "I think 225 closer fits this case," the prosecutor withdrew his objection, and the jury was instructed with CALCRIM No. 225.[9]

---

[9]    For the propensity evidence, the jury also was instructed with CALCRIM No. 1191A, evidence of uncharged sex offense. In pertinent part, the jury was told: "If you decide that the Defendant committed the uncharged offense you may but are not required to conclude from that evidence that the Defendant was disposed or inclined to commit sexual offenses and based on that decision also conclude that the Defendant was likely to commit [the crime] as charged here. [¶] If you conclude that the Defendant committed the uncharged offense, that conclusion is only one factor to consider along with all of the

10

B.    *Analysis*

On appeal, notwithstanding his trial counsel's concession, defendant argues CALCRIM No. 224 was required because the element in dispute was his conduct, not his intent.  And the prosecution substantially relied on circumstantial evidence—the propensity evidence that he had molested another adopted daughter—to prove that conduct.  He reasons that CALCRIM No. 224 would have advised jurors that if such circumstantial evidence allowed an interpretation pointing to innocence, the jury must adopt that interpretation.  Defendant is mistaken.

CALCRIM Nos. 224 and 225 instruct the jury that it cannot rely on circumstantial evidence to prove guilt or a mens rea element of the crime if that circumstantial evidence also could point to innocence.  But no such limitation applies to propensity evidence.  That is because propensity evidence—which is established by a mere preponderance of the evidence—cannot be used to establish an element of the crime.  (See *People v. Vichroy* (1999) 76 Cal.App.4th 92, 99; CALCRIM No. 1191A ["[propensity evidence] is not sufficient by itself to prove that the defendant is guilty of [the charged crime]"].)

Accordingly, CALCRIM No. 224 is not given where circumstantial evidence is offered only to bolster or corroborate direct evidence of an element.  (*People v. Samaniego, supra*, 172 Cal.App.4th at pp. 1171-1172 ["[CALCRIM No. 224] should not be given where circumstantial evidence is incidental to and corroborative of direct evidence "]; *People v. McKinnon* (2011) 52 Cal.4th 610, 676 [analogous instruction CALJIC No. 2.01 "need not be given when circumstantial evidence is merely incidental to and corroborative of direct evidence"].)

Here, the prosecution did not rely on circumstantial evidence alone to prove defendant committed the offense.  Instead, it relied on it only to corroborate the direct

---

other evidence.  It is not sufficient by itself to prove that the Defendant is guilty of the crimes charged in this case.  [¶]  The People must still prove each charge beyond a reasonable doubt.  Do not consider this evidence for any other purpose."

11

evidence of defendant's guilt—the victim's testimony. Because the circumstantial evidence that defendant previously molested another of his adopted daughters was not used to prove guilt, CALCRIM No. 225 was better suited to the state of the evidence and there was no cause to instruct the jury using CALCRIM No. 224.[10] Thus, it was not error for the trial court to instruct the jury using CALCRIM No. 225 when considering how to treat circumstantial evidence.

DISPOSITION

The judgment is affirmed.

      KRAUSE      , J.

We concur:

      BLEASE      , Acting P. J.

      MURRAY      , J

---

[10] Defendant briefly points to three other examples of evidence offered by the prosecution, which he maintains warranted CALCRIM No. 224: (1) his refusal, during the pretext call, to admit molesting the victim, which the prosecutor argued was motivated by his admission during a previous pretext call that he molested the younger sister; (2) the prosecution's argument that the victim's testimony reflected behavior similar to what the younger sister had reported; and (3) the expert's testimony regarding delayed reporting, failure to recall, and low rate of false accusations. This evidence was offered only to bolster or explain direct evidence of the offense. CALCRIM No. 224 therefore need not have been given.