Filed 6/8/23  P. v. Garcia  CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>ADRIAN GARCIA,<br><br>　　　Defendant and Appellant. | E078422<br><br>(Super. Ct. No. RIF2004247)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Samuel Diaz, Jr.

Affirmed.

Ellen M. Matsumoto, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Nora S. Weyl, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

A jury convicted defendant and appellant Adrian Garcia of four counts of engaging in oral copulation or sexual penetration with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (b); counts 1-4). The trial court sentenced defendant to 15 years to life in state prison on each count, with counts 2 and 4 to run concurrent, for an aggregate sentence of 30 years to life. On appeal, defendant contends his trial counsel was ineffective for failing to object to the psychologist's expert testimony that children do not lie about child molestation, requiring reversal of his convictions. We reject this contention and affirm the judgment.

# II.

## FACTUAL BACKGROUND

Jane Doe's paternal grandmother was married to defendant. Jane, who was born in June 2008, considered defendant to be her grandfather. Around Mother's Day 2019, when Jane was 11 years old, Jane told her maternal grandmother that defendant had touched her inappropriately. Jane's grandmother called Jane's parents, and Jane told her mother what defendant had done to her. Jane's mother reported the information to child protective services.

On April 29, 2020, when she was still 11 years old, Jane Doe attended a forensic interview during which she explained the events that occurred with her step-grandfather

defendant.[1] From age seven to age 11, Jane visited her paternal grandmother and defendant at their house in Riverside during summer vacations. While visiting her paternal grandparents, defendant molested Jane numerous times from the time she was age seven, eight or nine years of age until she was age 11. Jane recounted several incidents in detail.

Specifically, one night when Jane was eight or nine years old, she was sleeping between her grandmother and defendant and woke up to find defendant pulling her to the edge of the bed by her calves around 5:00 a.m. or 6:00 a.m. Defendant was squatting next to the edge of the bed as he pulled Jane, who was laying on her back, towards him. Defendant then pulled off her Jane's shorts and underwear and pushed her nightgown up towards her stomach. Defendant rubbed her vagina with his two fingers, which made her vagina feel "tingly." Defendant then penetrated her vagina with two fingers and moved it up and down inside of her. Jane explained that her vagina felt uncomfortable when defendant penetrated her with his fingers. After he penetrated her with his fingers, defendant licked Jane's vagina with his tongue until he was done or had to go to work. Jane noted that defendant moved his tongue all round her vagina, which made her feel "wet" and like she had to go to the bathroom. When defendant was done, he put Jane's clothes back on and moved her back to the middle of the bed. He would then take a shower, get dressed and leave. During the incident, Jane's paternal grandmother

---

[1] A video of the forensic interview was played for the jury at the time of trial. The transcript of the interview was admitted into evidence as People's exhibit No. 1A. At the time of trial, Jane was 13 years old.

3

remained asleep in the bed. Jane believed defendant's conduct was wrong, but she did not say anything because she thought she would get hurt.

Jane recalled another instance that occurred in defendant's living room when she was nine or 10 years old. Jane explained that she fell asleep on her blow-up bed on the living room floor and woke up to defendant carrying her to the couch. Defendant laid her down on the couch and positioned her head on the arm rest. He put one of her legs on the top of the back rest and the other leg hanging off the couch. Defendant removed her pants and underwear and rubbed her vagina with his fingers. He then penetrated Jane's vagina with his fingers and licked her vagina with his tongue. Another incident occurred at Jane's apartment in Las Vegas when she was nine years old and defendant stuck his hand inside her shirt while her parents and sister were also at the apartment. Specifically, Jane explained that defendant came up behind her, reached down her shirt, touched her bellybutton area, and hovered his hand in her torso area. When Jane moved to turn around, defendant quickly removed his arm.

Jane remembered another instance when defendant placed her hand on where he "goes pee" and moved her hand up and down rubbing his penis over his clothes. She recalled losing feeling in her hand and being so scared that she became numb. The last year that Jane visited her paternal grandmother and defendant's home in Riverside, she told her paternal grandmother that defendant had inappropriately touched her, but her paternal grandmother did nothing about it.

4

Jane's mother recalled receiving two calls from Jane around her ninth birthday. During the calls, Jane was upset, crying, and said that she wanted to come back home. Jane's grades started slipping the following school year, and Jane became distant and angry at home with her parents and sister. Jane's mother received emails from her teacher saying that she was not focusing and not doing well on assignments. Jane's parents believed that she was going through a "tween" stage.

A sexual assault child abuse detective testified about the investigative process, the commonality of late reporting by victims, and the lack of forensic evidence recovered in the majority of cases. The detective did not have Jane undergo a forensic examination because too much time had elapsed since the molestation incidents. The detective attempted to contact Jane's paternal grandmother because she was a potential witness, but she refused to interview with the detective.

Dr. Veronica Thomas, a clinical and forensic psychologist, testified regarding various subjects involving child sexual assault victims. She explained that sexual assault victims usually know their abusers, abusers groom their victims, victims delay disclosure of child sexual abuse when they know their abuser, victims often do not hate or disdain their abusers because they know them, victims' coping mechanisms, their inconsistencies in reporting the events, and other behavior commonly exhibited by victims of child sexual abuse. Dr. Thomas acknowledged that she did not interview Jane and knew nothing about defendant's case.

Jane's paternal grandmother testified in defendant's defense. She stated that it was impossible for defendant to molest Jane on the night Jane slept in their bed. She recalled the night that Jane requested to sleep with her and defendant in their queen-size bed because Jane was afraid was the only time that Jane slept with them. The paternal grandmother explained that she did not get any sleep that night as she was in the middle of Jane and defendant and it was very crowded in their bed. The paternal grandmother denied that she was asleep the night when Jane slept in their bed. The paternal grandmother also stated that Jane never told her that something inappropriate had happened between Jane and defendant and that if Jane had said something, she would have spoken to defendant and Jane's parents about it. The paternal grandmother admitted that defendant's attorney instructed her not to talk to anyone about the allegations.

## III.

## DISCUSSION

Defendant argues that his trial counsel was ineffective for failing to object to the forensic psychologist's expert testimony that "children do not lie about being molested" and that he was prejudiced by counsel's omission. The People respond that defendant mischaracterizes the psychologist's expert testimony as the psychologist never stated children do not lie about being molested and never vouched for Jane's credibility, and thus no objection was necessary. In the alternative, the People assert that any error was harmless.

6

A. *Additional Background*

Here, Dr. Thomas, a clinical and forensic licensed psychologist, testified regarding child sexual abuse and victim behavior, including delayed disclosure by victims, grooming, inconsistencies in victims' recollection of sexual abuse, and general behaviors of abusers and their victims. Dr. Thomas explained that it is a misconception that children are often sexually abused by strangers when the most of the children are sexually abused "in the context of a relationship," such as by people they know, people they trust, and those that they have an ongoing relationship. Further, it is common for victims to delay reporting the abuse and the disclosure may occur incrementally based on the age of the child and many psychological factors. Dr. Thomas indicated that generally, teenagers report the abuse "soon thereafter or within a year" and "little kids may or may not report, depending on the circumstances of the relationships involved." Dr. Thomas also testified about various coping behaviors utilized by children, such as by wanting to mostly watch movies and TV and play video games, not eating or having bathroom issues, the child becoming angry and defiant, changes in behavior, and depression.

Dr. Thomas does not conduct forensic interviews of child victim's as they are specialized and did not do so in this case. Dr. Thomas testified that she did not have any knowledge regarding the facts or allegations in defendant's case. She did not know Jane, had never met her, and never interviewed her. She also did not view the video of the forensic interview or review any of the reports in this case. Dr. Thomas explained that

7

she did not "know anything about this case" and that her expert testimony was about child sexual assault victims in general.

On cross-examination of Dr. Thomas, defendant's trial counsel attempted to have the expert testify about child abuse allegations based on false memories of the child and false memories created by others. The expert defined false memories as "the capacity to believe somebody else's encouragement about something that didn't happen." Prior to Dr. Thomas defining a false memory, the following colloquy occurred between defense counsel and Dr. Thomas:

"[DEFENSE COUNSEL] Q. . . . if a child is asked over and over again to retell something that's happened to them, something that may start as a false memory, I mean they believe that, and they've been asked to say it over and over again. Does that child really believe that that's true? Does that question make sense?

"A. Yes. Although you're asking about a false memory, something that never happened, something that you and your mom are talking about a picture. Well, yes. And in child sex abuse, there is no picture. It's just a talk, a disclosure, or not a disclosure. So they sort of don't go together, if you understand.

"Q. They don't. Because in a - - I mean I'm assuming in a child sexual abuse in a false memory, it could be a disclosure that's to something that isn't true; is that correct?

A. Yes. That would make it a lie though. And that's pretty unusual for this kind of an allegation."

8

Dr. Thomas explained that false memories start when "there's a suggestion from somebody, usually an adult that something has happened to the child. And the child has no recollection of it, but can be increasingly encouraged to believe certain things with education and pressure and suggestions, even though it may not have been the right time, the right year, the right day or anything." The expert further testified that although everyone lies, people do not lie about big things, such as "starting a fire or being molested or hurting somebody else" because "that's pretty audacious, and that's going to be difficult to uphold and sustain."

On redirect-examination, Dr. Thomas explained the reason why it would be difficult to "uphold and sustain" being molested because "the onus is upon the child to explain details of their experience. And those details are usually where there is no sexual abuse, are exotic and weird." Further, children do not recall explicit descriptive details about an incident of sexual abuse that occurred to them if it were a false memory. Defense counsel did not object to any of the above expert testimony.

B. *Governing Law*

"'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating . . . that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.] . . . If a defendant meets the burden . . . , he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." [Citation.]' [Citation.]" (*People v. Lopez* (2008) 42 Cal.4th 960, 966 (*Lopez*).)

Our Supreme Court has "often observed" that "whether or not to object to evidence at trial is largely a tactical question for counsel, and a case in which the mere failure to object would rise to such a level as to implicate one's state and federal constitutional right to the effective assistance of counsel would be an unusual one. [Citation.] An attorney may well have a reasonable tactical reason for declining to object, and '"[i]f the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation."' [Citation.]" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1312-1313 (*Seumanu*).)

A possible tactical reason for counsel to refrain from objecting may be counsel's "desire[] not to highlight the evidence by making an objection. '[T]he decision whether to object, move to strike, or seek admonition regarding [undesired] testimony is highly tactical, and depends upon counsel's evaluation of the gravity of the problem and whether objection or other responses would serve only to highlight the undesirable testimony.' [Citation.]" (*Seumanu*, *supra*, 61 Cal.4th at p. 1313.)

In this case, defendant contends that the testimony by Dr. Thomas that children do not lie about being molested vouched for Jane's credibility. Defendant cites to *People v. Julian* (2019) 34 Cal.App.5th 878 (*Julian*), *People v. Wilson* (2019) 33 Cal.App.5th 559

10

(*Wilson*) and *People v. Lapenias* (2021) 67 Cal.App.5th 162 (*Lapenias*) in support of his argument that testimony regarding children rarely lie about being molested is improper and that his trial counsel should have objected to the testimony, especially the redirect testimony.

In *Julian*, *supra*, 34 Cal.App.5th 878, the appellate court determined that statistical evidence presented by the prosecution's expert witness went beyond the permissible scope of the child sexual abuse accommodation syndrome (CSAAS) evidence and that defense counsel provided ineffective assistance by not objecting to it. (*Id*. at p. 880.) The expert made more than 10 statements referring to the small percentage or rarity of false reports of abuse based on various studies or articles. (*Id*. at pp. 883-885.) The statistics included testimony that false allegations of sexual abuse by children "'don't happen very often,'" and that "'[t]he range of false allegations that are known to law enforcement or [Child Protective Services] . . . is about as low as one percent of cases to a high of maybe 6, 7, 8 percent of cases that appear to be false allegations.'" (*Id*. at pp. 883, 885, italics omitted.) The appellate court found that the expert's "92 to 99 percent probability evidence invited jurors to presume [the defendant] was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case." (*Id*. at p. 886.) In determining that the defendant's trial counsel rendered ineffective assistance of counsel, the appellate court found that there was "no justification for counsel's failure to object to [the expert's] statistical evidence on false allegations. It was inadmissible and it improperly suggested [the defendant] was guilty based on statistical

11

probabilities that were irrelevant to this case." (*Id*. at p. 888.) Further, the evidence was "highly prejudicial" because there was a "credibility dispute between [the victim's] testimony and [the defendant's]" and "[i]t was a heavily contested case with strong defense evidence." (*Ibid*.) The court stated, however, that statistical evidence "may not be prejudicial where it occurs in a slight passing reference by the expert. But here the jury was bombarded with it." (*Ibid*.)

In *Wilson*, *supra*, 33 Cal.App.5th 559, the appellate court concluded that expert testimony that only a small percentage of child sexual abuse allegations are false should not have been admitted, but that the error was harmless. (*Id*. at pp. 561, 572.) The expert's testimony included statements that false allegations occurred "'very infrequently or rarely'" and that studies showed false allegations in one to six percent of cases. (*Id*. at p. 568.) The appellate court concluded that the testimony "had the effect of telling the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth." (*Id*. at p. 570.) The appellate court found that "the practical result was to suggest to the jury that there was an overwhelming likelihood [the victims'] testimony was truthful," which "invaded the province of the jury." (*Ibid*.) The appellate court ultimately concluded that the error in admitting the evidence was harmless under *People v. Watson* (1956) 46 Cal.2d 818. (*Wilson*, *supra*, at pp. 571-572.) Among other reasons, the appellate court explained that the expert's testimony on the statistical evidence was "brief"; the defense rebutted the evidence; the prosecutor did not mention the statistical evidence in argument; the jury was instructed that it was the sole judge of

the facts and of witness credibility; and the victims testified extensively and the jurors could assess their credibility. (*Id*. at p. 572.)

In *Lapenias*, *supra*, 67 Cal.App.5th 162, the appellate court determined that the trial court erred in allowing the CSAAS expert to testify that it is "'rare'" for children to make up a story that abuse occurred, but that the error was harmless. (*Id*. at p. 166; see also *id*. at pp. 177, 180.) The Court of Appeal determined that the testimony "went considerably beyond the limited purpose of CSAAS evidence (to explain the typical behaviors of sexually abused children, such as delayed reporting)" and—"by implication and by inference—violated the general rule that an expert may not give an opinion as to whether another witness is telling the truth or the defendant is guilty." (*Id*. at p. 179.) The appellate court found that there was "'no meaningful distinction between giving a statistic that indicates that false allegations are rare and stating that children rarely make false allegations without explicitly quantifying the word "rare." The problem with both assertions is that [the] expert is vouching for the veracity of the' alleged victims." (*Id*. at pp. 179-180.) The Court of Appeal nevertheless concluded the error harmless. (*Id*. at p. 180 [applying *Watson* test].) The appellate court reasoned that the expert's testimony was "brief" as were the references to the testimony by both counsel during argument; there was persuasive corroborative evidence of the defendant's guilt; and the jury was instructed regarding the limited purpose of CSAAS evidence, that they were not bound by an expert's opinion, and that they were the sole judge of witness credibility. (*Id*. at p. 180.)

In this case, assuming that an objection would have been sustained to Dr. Thomas's testimony that children do not lie about being molested (and that the testimony would have been stricken), we find that a plausible reason exists for trial counsel's failure to object. The testimony was limited to two sentences on cross-examination and one sentence on redirect examination. Given the brevity of the testimony about children rarely lying about being molested and the context in which the testimony was made, i.e., children's recollections to report details of the abuse in false memory circumstances, defendant's trial counsel may well have determined that an objection (accompanied by a motion to strike) would serve only to highlight the brief testimony that the jurors might otherwise not give much attention to. (See *Seumanu*, *supra*, 61 Cal.4th at p. 1313.) Indeed, defendant concedes "it would be understandable for trial counsel not to object to Dr. Thomas's initial testimony on cross-examination that children do not lie for fear that the objection 'would serve only to highlight the undesirable testimony.'" This case is therefore distinguishable from *Julian*, where the "jury was bombarded with" more than 10 statements by the prosecution's expert about the rarity of false reports of abuse and the appellate court found "no justification for counsel's failure to object." (*Julian*, *supra*, 34 Cal.App.5th at pp. 888, 883-885; see also *id*., at p. 888 [the "evidence may not be prejudicial where it occurs in a slight passing reference by the expert"].) Instead, this case is analogous to *Wilson* and to *Lapenias*, where the expert's testimony was "brief." (*Wilson*, *supra*, 33 Cal.App.5th at p. 572; *Lapenias*, *supra*, 67 Cal.App.5th at p. 180.) Accordingly, "[t]here being a plausible reason why counsel did not object, we cannot

14

conclude on this record that counsel's inaction lacked a reasonable tactical basis." (*Seumanu*, *supra*, at p. 1313.)

To the extent defendant's trial counsel erred in failing to object to the challenged testimony, we determine that defendant fails to demonstrate counsel's purported deficiency resulted in prejudice. (See *Lopez*, *supra*, 42 Cal.4th at p. 966.) Dr. Thomas's challenged testimony was "brief" (*Lapenias*, *supra*, 67 Cal.App.5th at p. 180; *Wilson*, *supra*, 33 Cal.App.5th at p. 572), and the jury was not "bombarded" on this point during Dr. Thomas's testimony or during argument by counsel. (*Julian*, *supra*, 34 Cal.App.5th at p. 888; see *Lapenias*, *supra*, at p. 180.) Further, the jury was instructed regarding the limited purpose of Dr. Thomas's testimony and that it was "'not evidence that the defendant committed any of the crimes charged against him,'" as well as instructed that they were not bound by an expert's opinion and that they were the sole judge of witness credibility. (*Lapenias*, *supra*, at pp. 175, 180; see CALCRIM Nos. 1193, 332, 226.) Jurors are ordinarily presumed to understand and follow the instructions given. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

Moreover, Dr. Thomas made it clear that she had never met Jane and had not viewed the forensic interview or read the reports. She further testified that she did not know anything about the case and that her testimony was about victims of child sexual assault as a "class in general" and "disclosure patterns of victims." Dr. Thomas was not vouching for the veracity of Jane's testimony or bolstering her testimony because she knew nothing about the specific allegations. Rather, it was Jane's detail accounts from

15

her forensic interview and the consistency in her testimony that bolstered her credibility. On this record, defendant fails to establish "'a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."'" (*Lopez, supra*, 42 Cal.4th at p. 966.)

## IV.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

Acting P. J.

We concur:

FIELDS

J.

RAPHAEL

J.