Filed 7/22/21  P. v. Lavaki CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LATU KAMISESE LAVAKI,<br><br>    Defendant and Appellant. | A156498<br><br>(San Mateo County<br>Super. Ct. No. 16SF006435) |

Defendant Latu Kamisese Lavaki was accused of sexually abusing his great-niece, S.,[1] between 2005 and 2007.  A jury convicted defendant of committing a lewd and lascivious act on a child under the age of 14 (Pen. Code, § 288, subd. (a))[2] and sexually penetrating a child under the age of 14 (§ 289, subd. (j)).  The jury was unable to reach a verdict on whether defendant orally copulated a child under the age of 14 (former § 288a, subd. (c)(1)).  The court declared a mistrial as to that count.  The trial court sentenced defendant to eight years in prison.

On appeal, defendant contends he was denied a fair trial due to improper testimony provided by the prosecution's expert on child sexual

---

[1] We refer to some persons by their first names and initials for privacy. (Cal. Rules of Court, rule 8.90.)

[2] All further undesignated statutory references are to the Penal Code.

1

abuse accommodation syndrome (CSAAS), who testified on cross-examination that studies show only a very small percentage of allegations of child sexual abuse are false. Although there was error, we conclude the admission of this testimony did not prejudice defendant. We agree with the parties that the abstract of judgment and the sentencing minute order should be amended to conform with the oral pronouncement of judgment. In all other respects, we affirm.

**EVIDENCE AT TRIAL**

A. *Charged Sexual Offenses—Molestation of S.*

S. was 19 years old in 2018, when she testified at trial. In 2006, when she was six or seven years old, S. often spent time at her maternal grandmother's house in Millbrae (the Millbrae house). Defendant, who was married to S.'s great-aunt, E., lived at the Millbrae house, along with various members of S.'s extended family.

In December 2006, while S. was on winter break during first grade, she was alone watching television in the living room at the Millbrae house. Typically, several relatives would have been home. However, on this occasion, only defendant and S.'s uncle Michael were home. Somewhere between 5:00 p.m. and 8:00 p.m., defendant walked into the living room with S.'s favorite candy bar. Defendant spoke broken English, which S. could not always understand, but through words and gestures he beckoned for her to follow him upstairs to the bedroom over the garage. When S. walked into the bedroom, defendant was already in the bed. Defendant had the candy bar in his hand and beckoned S. toward the bed. S. got on top of the bed. Defendant unbuttoned S.'s jeans and took off her underwear. Defendant licked the candy bar and "put[] it on" her. Defendant then inserted his fingers and moved them around inside of S.'s vagina. S. told him to stop

2

because it hurt.  Defendant told her to be quiet.  Defendant then used his tongue to lick S.'s vagina.  S. was very confused and did not understand what defendant was doing to her.

At some point, S.'s uncle Michael walked into the bedroom.  Michael looked at defendant and S. from the doorway for less than a minute and left.  S. next remembered being back in the living room alone, fully clothed, and waiting for her mother, Sophia, to pick her up.

Sophia recalled that defendant answered the door at the Millbrae house that evening when she arrived after work.  Sophia's "heart sank."  Sophia was shocked and "freaked out" because S. had been alone with defendant at the house.  Sophia knew what defendant was capable of and never anticipated that defendant would be alone with her daughter since he was always working.

On the way home, S.'s mother asked many questions:  " '[A]re you okay?  Did anything happen?  Did he touch you?  Did he do anything to you?' . . . 'Why were you the only one there?' "  S. did not recall her mother saying defendant's name, but she assumed her mother was referring to him.  S. was scared and confused and did not completely understand what defendant had done to her.

It was not until middle school that S. realized what defendant did to her was wrong.  It was when S. took a health class in high school that she actually understood that defendant molested her.  The thought of what defendant did to her was always on her mind.  Even after S. fully understood that what defendant did to her was "bad," she did not tell anyone about it because she was afraid of backlash from the family.  Therefore, she kept it to herself.

It was not until S. was 16 years old that she had an opportunity to talk to her mother about the molestation. One day in August 2015, the topic of boys and men came up while Sophia and S. were on the way to visit a sick relative. Sophia told S. that she had been molested when she was young. S. recalled that she interrupted her mother and told her that something had happened to her too when she was young. S. had difficulty talking about it. S. put her hands over her head and put her head on her knees, as she told her mother about the molestation. Sophia asked her, " 'With who [*sic*]?' " S. responded, " 'With Latu [defendant].' " Sophia was heartbroken and upset. She pulled her car off of the freeway. Sophia cried and said, " 'No, no,' . . . 'Why is this happening again?' " After Sophia regained her composure, S. recalled that her mother told her that defendant molested her too.

Instead of going to visit their sick relative, Sophia and S. went to see Sophia's sister, Mary M. Sophia cried and told Mary what had happened to S. S. confirmed that she had been molested by defendant.

The following day, Sophia asked S. about the details of the molestation. S. became "distraught." S. put her hands over her head and rocked back and forth. S. then told her mother exactly what happened.

S. and Sophia decided to speak with a bishop at their church because S. was feeling "very low . . . ." Sophia and S. told the bishop that defendant had molested both of them. The bishop offered guidance, but he did not contact the police.

On August 23, 2015, Sophia called the police to report that defendant had molested S. When the police asked if she knew whether defendant had molested anyone else, Sophia told the police that he had molested her (Sophia), too. S. remembered telling Detective Joseph Cang of the San Mateo County Sheriff's Office, as well as her mother and a counselor, that the

molestation seemed like a "dream[.]" S. clarified that she was "100 percent" certain that defendant molested her and that she coped with it by putting it aside in her mind, thinking of it as a "dream" or "nightmare" so that she would not have to deal with it.

**B.** ***Prior Sexual Offenses (Admitted Under Evid. Code, § 1108)***

    1. *Sophia*

Sophia was 39 years old at the time of trial. Sophia's aunt, E., was married to defendant. Sophia often went to the Millbrae house to visit with her cousins M. Doe (M.D.) and L. Doe (L.D.). When Sophia was a young child, she regularly slept over at the Millbrae house on weekends, and more often during the summer while her mother worked. Aunt E. and defendant lived in one of the bedrooms at the time. M.D. and L.D. often slept there on weekends, as well; all three girls slept on couches or mattresses on the floor in the front room.

The first time defendant molested Sophia, she was sleeping in the living room with her cousins M.D. and L.D. Defendant put his hand on Sophia's pelvic area, under her blanket. When Sophia woke up, defendant "told her to 'Sh.' " Defendant took off Sophia's pants and touched the inside of her vagina. Defendant also put his hand underneath her shirt and touched her chest. Defendant told Sophia that if she ever told anyone, no one would believe her and her father, who was then a church bishop, would lose his title. Sophia did not tell anyone what defendant did to her because she was afraid of what would happen to her father.

The day after the first molestation, Sophia was playing hide and seek with her cousins and hid in the garage, which functioned as a guest bedroom. Defendant was in the garage, wearing only a tank top and a towel. Defendant told Sophia to be quiet and laid her down on the bed. Defendant

5

took her pants and underwear off, put a thin sheet over her vagina, and inserted his penis just outside of her vagina. When the cousins called her name, defendant told them that Sophia was not there and to go away. Sophia was scared. Defendant put Sophia's clothes back on her and sent her back out to play.

Over the next two to three years, defendant molested Sophia at least 50 times at the Millbrae house. The molestations generally occurred in the living room after defendant got home late at night and while Sophia was sleeping. The other children did not wake up, and Sophia did not try to alert them.

Once, when Sophia was about seven or eight years old, Aunt E. called her into her bedroom. M.D. and L.D. were already in the bedroom. Aunt E. asked the girls if defendant had been touching them, and they told her that he had been doing so. Sophia specifically told Aunt E. that defendant touched her on her vagina and chest. Aunt E. told her, " 'Sh, don't say those things. Kids your age shouldn't talk like that.' " Aunt E. told the girls not to say anything about it and she would take care of it.

After the meeting with Aunt E., defendant molested Sophia again. As far as Sophia knew, Aunt E. did not do anything about it. Sophia still did not report defendant 's molestations to the police.

When Sophia was 13 or 14 years old, Aunt E. again asked her and the cousins whether defendant molested them. Sophia again told Aunt E. that defendant molested her.

2.    *L.D.*

L.D. was 38 years old at the time of trial. L.D. lived at the Millbrae house during the time she was four to seven years old. Defendant moved into

the Millbrae house at some point when L.D. lived there. At first, he slept in the garage. Defendant later married L.D.'s aunt, E.

Defendant molested L.D. on one occasion when she was six or seven years old. At one of the large family gatherings at the Millbrae house, defendant told L.D. to come sit by him on the couch in the living room. When L.D. sat down, defendant put his hand underneath her dress, pulled her underwear aside, and moved his hand around her vaginal area for about five to ten minutes.

One day, L.D. overheard Sophia and M.D. telling each other that defendant had done something to both of them. L.D. told them, " 'Oh, that happened to me too.' " L.D. thought someone overheard their conversation because shortly thereafter, the girls had a meeting with Aunt E. Aunt E. met with Sophia, M.D., and L.D. in her bedroom. L.D. recalled that her aunt asked them if they had been talking "about something that happened with Latu" and the girls said yes. Their aunt was mad at them. She asked them why they were talking like that and told them that kids were not supposed to talk like that. Aunt E. told them never to talk about it again. L.D. did not tell her mother or anyone else because she felt she had to obey her aunt because she was an adult.

When L.D. was about 12 years old, her mother spoke with Aunt E. on the phone. L.D. recalled that her mother then asked her (L.D.) "if Latu [defendant] ever did anything to [her]." L.D. confirmed that defendant molested her. L.D. did not recall anything coming of the conversation.

In 2015, Sophia told L.D. that defendant molested S.

3.    *M.D.*

M.D. was 39 years old at the time of trial.  M.D. lived at the Millbrae house during the time she was five to eight years old.  Defendant sexually molested M.D. three times when she was about six or seven years old.

The first time, M.D. was playing hide-and-seek with her cousins and was looking for a place to hide in the living room.  When M.D. ran past defendant, he grabbed her, pulled her onto a mattress that was in the living room, restrained her with his arm, put his tongue down her throat, moved his hands over her chest and underneath her dress, and then touched the outside of her vaginal area over her underwear.  When the other children came into the house, defendant let M.D. go.

The second molestation occurred under similar circumstances, in the garage, except that defendant touched her vagina beneath her underwear.  M.D. could feel defendant's erect penis pressed against her back.  The third molestation occurred in the bedroom above the garage and was similar to the other two incidents.

M.D. did not discuss the molestations with anyone because she did not know if they were wrong or not.  M.D. tried to suppress her memory of the molestations; eventually, she went to therapy to process what happened to her.  She had no memory of discussing the molestations with Sophia and L.D. when she was eight or nine years old.

Sometime when M.D. was between the ages of 13 and 15, she talked with her sisters about the molestations.  Around that time, M.D. met with Aunt E., Sophia, and L.D., and they discussed the molestations.  M.D. believed that defendant was also present during the meeting.  Aunt E. asked the girls if something happened.  Aunt E. indicated to the girls that she was going to fix it and told them not to say anything.

8

M.D. recalled having a second meeting with Aunt E., Sophia, and L.D. about the molestations. Aunt E. asked again what had occurred, and the girls again told her what defendant had done to them. Aunt E. again said she would fix it. M.D. did not feel that she could talk about the molestations with anyone else because Aunt E. told her not to say anything about it. M.D. said that Aunt E. had a big influence on the children in the family and that she was not the kind of person you would want to "mess with."

Sophia later told M.D. that defendant molested S. M.D. and Sophia also discussed how defendant molested them when they were children. M.D. advised Sophia to call the police because she did not want S. to go through what she went through emotionally.

## C. *Expert Testimony*

As discussed in greater detail *post*, the prosecution called an expert witness, Anthony Urquiza, a psychologist at the UC Davis Medical Center, to testify about CSAAS, including the five recognized aspects: (1) secrecy; (2) helplessness; (3) accommodation; (4) delayed and/or unconvincing disclosure; and (5) retraction. He explained that accommodation in the context of CSAAS means how children learn to manage or cope with the unpleasant feeling about being sexually abused.

Dr. Urquiza emphasized that CSAAS is an educational, not a diagnostic, tool. He was unaware of the facts in this case and could not offer an opinion as to whether any person involved was abused. Dr. Urquiza explained that CSAAS is not intended to determine whether a child has in fact been abused. Rather, it is a method of educating therapists about the dynamics of child sexual abuse and the way abused children may act.

**D.    *Defense Evidence***

Defendant testified on his own behalf. He denied ever molesting S., Sophia, L.D., and M.D. Defendant never spoke to his wife, E., about the molestation allegations. For her part, E. denied ever meeting with Sophia, L.D., and M.D. to talk about defendant's molesting or abusing them.

Defendant testified that he worked in Atlanta between August 2006 and February 2007. He said that he did not return to the Bay Area during Christmas 2006.

Defendant presented four character witnesses, all of whom described him as an honest and truthful person. Two additional witnesses testified that they had lived at the Millbrae house and never saw signs that defendant was abusing any of the girls.

Bishop Salesio Langi testified that Sophia and S. met with him in August 2015. Sophia and S. both were crying and "very emotional" as they told him that defendant had molested them. Bishop Langi spoke to defendant and his wife later that week. Defendant denied the allegations.

San Mateo County Deputy Sheriff Victor Bertolozzi testified that he read the initial police report and also observed S.'s interview at the Keller Center for Family Violence Intervention at the San Mateo Medical Center (Keller Center). S. was distraught and crying during the interview. S. did not tell the counselor that defendant licked the chocolate bar or used it in a sexual manner. S. said that it hurt when defendant put his fingers in her vagina and used his tongue on her. She also said that her uncle Michael and defendant looked at each other during the incident. S. was not sure what her uncle Michael saw.

On May 3, 2016, Bertolozzi interviewed defendant's stepson Michael, who was also S.'s uncle. Michael cried and was upset during the interview.

Sergeant Joseph Cang of the San Mateo County Sheriff's Office testified that he took over the case from Bertolozzi in May 2016.[3] Before interviewing S., Cang reviewed her interview at the Keller Center. In speaking with Cang, S. initially said the incident occurred when she was six or seven years old and in the first grade. She later narrowed the timeframe to a two-week school break in December 2006. S. told Cang that it did not hurt when defendant put his fingers in her vagina.

Michael testified at trial that he never saw defendant molest S. He was shocked and upset by the allegations.

## DISCUSSION

### A.    *Admission of the Statistical Data*

Defendant contends that Dr. Urquiza's testimony that false allegations of abuse are statistically infrequent was inadmissible. The Attorney General asserts that defendant invited the error, and forfeited any claim to it, by soliciting the statistical testimony during cross-examination. Defendant therefore alternatively argues his counsel was constitutionally ineffective.

#### 1.    *Additional Background*

On direct examination, the prosecutor elicited testimony from Dr. Urquiza regarding the five recognized CSAAS elements: (1) secrecy; (2) helplessness; (3) accommodation; (4) delayed and/or unconvincing disclosure; and (5) retraction. During cross-examination, defense counsel asked Dr. Urquiza about the retraction element of CSAAS. Specifically, defense counsel questioned Dr. Urquiza about his testimony on direct examination that the incidence of retraction was "extremely low, at some point as low as 4 percent[.]" Although he could not recall his prior testimony, Dr. Urquiza indicated that research supported this percentage. When

---

[3] Cang was a detective at the time he took over the case.

11

defense counsel asked whether "some studies have it as high as 20 to 25 percent," Dr. Urquiza responded, "I'm not aware of a study that's in the 20 to 25 percent. To my knowledge, *the range of allegations of false abuse is as low as 1 to 6 percent*." (Italics added.) Defense counsel clarified that he was "asking about whether or not 20 to 25 percent of the children *retract*." (Italics added.) Dr. Urquiza responded, "I'm sorry. You're talking about retraction. My mistake. Yes. I did, in fact, say earlier today about 20 to 25 percent of kids who come before law enforcement or CPS retract—who have been abused would retract that allegation."

The prosecutor opened her redirect examination by "picking up on that topic of false allegations . . . ." Dr. Urquiza explained that false allegations of sexual abuse most frequently occurred in disputed child custody situations, in which the false allegations were made by one of the parents involved. Dr. Urquiza qualified, "Well, just the fact that—do false allegations happen? Yes. But the number of cases in which false allegations of sexual abuse occurs is really pretty small. And when it does happen, it appears that that [*sic*] the largest subgroup is a situation where there is some type of custodial dispute."

During his recross-examination, defense counsel discussed his impression that in the CSAAS framework, a therapist assumes a child's allegations of sexual abuse are true and it is unimportant whether the allegations are, in fact, true. Dr. Urquiza responded, "I think, if you look at the context of a therapist treating a child who's been referred because of sexual abuse, by far, they're almost all sexually abused. Is it either—because of the way in which they're referred? If you just look at the numbers and frequency of false allegations, it just doesn't happen very often."

Defense counsel then asked Dr. Urquiza if his conclusion that the "very low" frequency of false allegations was "based on this assumption that one always will know actually what the truth is when someone retracts or doesn't admit it? . . . [Y]ou're basing your assumption on facts that I don't think necessarily you can ever prove definitively." Dr. Urquiza responded, "There are about 15 or so empirical studies looking at the false allegations of sexual abuse. The range—the lowest is about 1 percent. The highest is about 6 percent. The study I referenced earlier, it's a Canadian study. It's about 4 percent, right in the middle. So while you can argue that false allegations do happen, they don't happen very often. And I would probably, if you've got to push me to a number—I would like to stay with a range because that's what the research says. But within that, in the middle of that range, is about 4 percent. Do they happen? Yes. Do they happen often? No."

2.    *Analysis*

Expert testimony on "the common reactions of child molestation victims," known as CSAAS theory evidence, is admissible " 'to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301.) But such evidence "is not admissible to prove that the complaining witness has in fact been sexually abused." (*Id.* at p. 1300.)

After defendant's trial, two pertinent California cases were decided which held statistical data on false allegations of child sex abuse is inadmissible (*People v. Julian* (2019) 34 Cal.App.5th 878, 887 (*Julian*); *People v. Wilson* (2019) 33 Cal.App.5th 559, 571 (*Wilson*)). In both cases, Dr. Urquiza was the expert for the prosecution and presented nearly identical testimony about the low percentage of false allegations in child sexual abuse

13

cases. (See *Julian, supra*, 34 Cal.App.5th at pp. 883–884; *Wilson, supra*, 33 Cal.App.5th at pp. 565–566.) Even though defendant arguably forfeited any challenge to this testimony, we exercise our discretion to address the issue on the merits. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.)

In *Julian*, the appellate court agreed with the defendant's contention that the statistical evidence "was highly prejudicial, and deprived him of his right to a fair trial." (*Julian, supra*, 34 Cal.App.5th at p. 885.) The court explained: "The expert providing CSAAS testimony may not give ' "general" testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused.' [Citation.] Nor is it proper for an expert to present 'predictive conclusions' [citation], such as alleged child abuse victims 'should be believed' or 'abused children give inconsistent accounts and are credible nonetheless' [citation]. Such predictive conclusions go beyond the scope of CSAAS evidence and may confuse the jury. '[T]he jurors' education and training may not have sensitized them to the dangers of drawing predictive conclusions.' [Citation.] Where expert opinions on the statistical probability of guilt are admitted, the jury may be 'distracted' from its 'requisite function of weighing the evidence on the issue of guilt,' and may rely instead on this 'irrelevant' evidence. [Citation.]" (*Id.* at pp. 885–886.)

The *Julian* court concluded that probability evidence "invited jurors to presume [the defendant] was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case." (*Julian, supra*, 34 Cal.App.5th at p. 886.) Finding these errors prejudicial—under either the *Chapman* standard of prejudice, which requires reversal unless the error is harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24), or the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836

14

(*Watson*), which requires reversal only if it is reasonably probable the defendant would have received a more favorable result in the absence of the error—the appellate court reversed. (*Julian*, at p. 890.)

In *Wilson*, our colleagues in Division Four of this appellate district found Dr. Urquiza's testimony was improperly admitted but not prejudicial under the *Watson* standard. (*Wilson, supra*, 33 Cal.App.5th at pp. 571–572.) In finding the error harmless, the *Wilson* court cited the relative brevity of the improper expert testimony, the fact that the expert acknowledged it was difficult to determine whether an allegation was false, and the expert's admission he had come across two cases where he believed the child he treated was making false claims of sexual abuse. (*Id.* at p. 572.) The *Wilson* court further noted the prosecutor did not mention the statistical evidence in closing argument. (*Ibid.*) And the jury was instructed that it was the sole judge of the facts and the credibility of witnesses. (*Ibid.*) Also, the two victims testified extensively and the jurors could assess their credibility, and other percipient witnesses were called. (*Ibid.*) Under these circumstances, the *Wilson* court could not find a reasonable probability the defendant would have achieved a more favorable result in the absence of the challenged testimony. (*Ibid.*)

We agree with the *Wilson* court's application of the *Watson* standard. (See *People v. Prieto* (2003) 30 Cal.4th 226, 247 ["The erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error' "].) Applying this standard, we conclude the error in admitting the statistical evidence in this case was harmless. The improper expert testimony took comparatively little time in the context of the entire trial. Further, defense counsel capitalized on this evidence during his closing

15

argument. Defense counsel pointed out that therapists, like Dr. Urquiza, were primarily charged with providing therapy and not with finding out the truth of a child's sexual abuse allegation. He pointed out that even Dr. Urquiza had encountered false allegations in his practice. Additionally, defense counsel linked the false allegation/memory evidence directly to defendant's case, pointing out to the jurors that Michael did not see what S. claimed he saw and that Aunt E. testified that she never had any meetings with her nieces about defendant's molestation of them.

Contrary to defendant's contention, the evidence against him was strong. S. provided detailed testimony about the sexual abuse that she endured at defendant's hands. S.'s prior statements disclosing the abuse were generally consistent with her trial testimony.

Moreover, S.'s account of defendant's offenses against her was similar to the prior offenses he committed against Sophia, L.D., and M.D., providing strong evidence of defendant's propensity to commit such offenses against young girls in their familial home. For these reasons, the jury was likely to have found S.'s testimony credible, even without the objectionable evidence.

Defendant disagrees, claiming that S.'s credibility was undermined by her statements to her mother, Cang, and the Keller Center counselor that she had convinced herself that the molestation must have been a "dream." Dr. Urquiza's properly admitted testimony explained that sexually abused children often dissociate themselves from the abuse as a means to "accommodate" or cope with the difficult feelings they may have surrounding the abuse. Dr. Urquiza further explained that dissociation "means either to suppress the feelings that you have, the sense of shame or humiliation; to compartmentalize it, to put it in a box; to do something to not so acutely feel those feelings." He added, "If you can manage your feelings by dissociating,

16

by suppressing, by compartmentalizing, then it's one way at least to cope with that situation . . . ."

S.'s testimony that she felt like she had been in a "dream" is entirely consistent with the accommodation aspect of CSAAS. Specifically, she said that she had learned to cope with the sexual abuse by putting it aside in her mind and thinking of it as a "dream" or "nightmare" because she did not want to deal with it. S., however, was "100 percent" certain that defendant molested her.

Further, while S. was confident that Michael appeared in the doorway during the molestation, despite Michael's testimony to the contrary, Dr. Urquiza's properly admitted testimony regarding the "delayed, conflicting, and/or unconvincing disclosure" aspect of CSAAS informed the jury that it was not uncommon for victims of childhood sexual abuse to get some details wrong. Similarly, the other seeming discrepancies[4] in S.'s testimony that defendant claims undercuts S.'s credibility could be explained by the conflicting/unconvincing disclosure aspect.

Defendant avers that any doubt regarding prejudicial error should be resolved in his favor under any standard because this was a "close case" based on the fact that the jury was deadlocked on one of the three counts against him. We disagree. The jury's inability to reach a verdict on the oral copulation count dispels the notion that the admission of the statistical evidence was prejudicial. (See *People v. Rucker* (2005) 126 Cal.App.4th 1107,

---

[4] Defendant contends that S.'s testimony "was contradicted in myriad ways." He cites his testimony that he was in Atlanta during the time the molestation was alleged to have occurred. Defendant further notes that S. initially denied that he touched her and that she gave conflicting accounts about whether the alleged digital penetration of her vagina hurt. As a reviewing court, we do not reweigh the evidence or revisit credibility issues. (*People v. Icke* (2017) 9 Cal.App.5th 138, 147.)

1120 [hung verdict tended to show jury did not convict defendant based on inflammatory evidence].) Rather, the fact that the jury convicted defendant of two of the three counts demonstrates that the jury carefully assessed the facts and credibility of the witnesses.

Here, as in *Wilson*, the trial court instructed the jurors that they were the sole judges of the facts and credibility of the witnesses. (CALCRIM Nos. 200, 266.) The trial court also gave a special instruction based on CALCRIM No. 1193 regarding the limited purpose of the CSAAS evidence.[5] Without any evidence to the contrary, it is presumed that the jury followed the court's instructions. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248)

This case is distinguishable from *Julian, supra*, 34 Cal.App.5th 878, where the court found prejudice. In explaining the prejudice aspect, the *Julian* court noted that not only had the prosecutor introduced the statistical evidence regarding false allegations and invited the jurors to use it during their deliberations but also defense counsel repeatedly mentioned the statistical evidence during closing argument and solicited the detective's improper opinion testimony that the child had been "honest" with him when she made her claims of sexual abuse. (*Id.* at pp. 888–890.) The *Julian* court also pointed out that the victim's reports of abuse were riddled with inconsistencies and there was no evidence corroborating the victim's molestation claim. (*Id.* at p. 888.)

---

[5] Special jury instruction 10.64 provided, in part, as follows: "Evidence has been presented to you concerning [CSAAS]. This evidence . . . must not be considered by you as proof that the defendant committed any of the crimes charged against him. [¶] . . . The People have the burden of proving guilt beyond a reasonable doubt. [¶] You may consider this evidence only in deciding whether or not [S.], Sophia, [M.D.] and [L.D.]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

Here, unlike in *Julian*, S.'s testimony was generally consistent and there was extensive corroborating evidence supporting her claim. Specifically, three other victims—Sophia, L.D., and M.D.—testified that they had been abused by defendant in the Millbrae house when they were about the same age as S. Furthermore, the prosecutor here did not introduce the statistical evidence about false allegations and did not refer to it during closing argument.

Under the *Watson* standard, we conclude there is no reasonable probability that defendant would have obtained a more favorable result in the absence of Dr. Urquiza's brief testimony about the statistical evidence regarding false allegations of child sexual abuse.[6]

## B.    *The Abstract of Judgment and Sentencing Minute Order*

Defendant contends, and the Attorney General agrees, that the abstract of judgment and sentencing minute order should be amended to reflect the trial court's oral pronouncement of the judgment regarding fines and fees.

In the presentencing report, the probation department recommended the imposition of various fines and fees, including a $300 restitution fine and a 10-percent collection fine under section 1202.4, subdivision (b).

At the sentencing hearing, the parties stipulated that defendant was indigent. In light of this stipulation, the trial court indicated that it would "permanently stay" the imposition of the restitution fine and the

---

[6] Having concluded the admission of the statistical evidence was harmless, any claim of ineffective assistance of counsel necessarily fails. (See *People v. Catlin* (2001) 26 Cal.4th 81, 162–164 [defendant must establish deficient performance and resulting prejudice].)

assessments.[7] However, the abstract of judgment and the sentencing minute order reflect that a $300 restitution fine and 10-percent administration fine, for a total of $400, were imposed.

"Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385; accord, *People v. Mesa* (1975) 14 Cal.3d 466, 471.) Here, the oral pronouncement controls over the inconsistent and incorrect sentence set forth in the abstract of judgment and sentencing minute order. Accordingly, the abstract of judgment and sentencing minute order must be corrected to accurately reflect the trial court's oral pronouncement.

Finally, the abstract of judgment must be amended to correct a typographical error in the spelling of defendant's middle name.

## DISPOSITION

The abstract of judgment and sentencing minute order are modified to reflect that the $300 restitution fine and 10-percent collection fee imposed under section 1204.4, subdivision (b) are permanently stayed. The abstract of judgment is further modified to reference defendant's middle name as "Kamisese."

The trial court is directed to prepare a corrected abstract of judgment and to correct the sentencing minute order dated February 8, 2019, in accordance with this disposition. The trial court is further directed to

---

[7] The stay did not encompass the victim restitution ordered pursuant to section 1202.4, subdivision (f). The trial court stated it would retain jurisdiction over the matter of victim compensation and would order restitution in amounts to be determined. The sentencing minute order and abstract of judgment accurately represent the court's oral pronouncement of the judgment in this regard.

20

forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

_____

Jackson, J.


WE CONCUR:


_____

Fujisaki, Acting P. J.


_____

Chou, J.*


A156498/*People v. Latu Kamisese Lavaki*

---

\* Judge of the Superior Court of San Mateo County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.