Filed 10/26/23  P. v. Long CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B325409 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA078020) |
| v. | |
| ROBERT KEVIN LONG, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General for Plaintiff and Respondent.

A jury found defendant Robert Kevin Long guilty of five counts of committing a lewd act upon a child (counts 1, 4, 6, 7, & 9; Pen. Code,[1] § 288, subd. (a)) and three counts of continuous sexual abuse (counts 3, 5, & 8; § 288.5, subd. (a)).  The jury further found true allegations that the crimes involved multiple victims.  (§ 667.61, subds. (b) & (e).)  The court sentenced defendant to prison for 120 years to life.

Defendant contends (1) the court erroneously admitted evidence of child sexual abuse accommodation syndrome (CSAAS); and (2) he was denied his right to effective assistance of counsel.  We reject these contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

### A.    Prosecution Evidence

#### 1.    *T.C.*[2]

T.C. testified to the following.

In September 1990, when T.C. was 10 years old, T.C.'s mother began a dating relationship with defendant.  The three of them and T.C.'s brother lived together in a house in Carson.

On numerous occasions over a two-year period, defendant would enter T.C.'s bedroom at night, pull down T.C.'s pants and rub his penis on T.C.'s "butt" until he ejaculated.  The contact was "skin to skin."  He told T.C., "Don't tell your mother." Defendant sometimes engaged in similar conduct during the

---

[1] Subsequent unspecified statutory references are to the Penal Code.

[2] The prosecution did not allege any crime committed against T.C.  Her testimony was introduced pursuant to Evidence Code section 1108, subdivision (a).

daytime, after T.C. came home from school. On one occasion, defendant tried to penetrate T.C. vaginally, but stopped when she screamed. He then tried to penetrate her rectum. Other times, defendant would rub T.C.'s breasts and her vaginal area with his hand. Defendant told T.C. that if she told her mother, "he would hurt [her] mother." T.C. took these threats seriously.

Defendant's sexual abuse of T.C. occurred between 50 and 100 times. The abuse ended when defendant and T.C.'s mother ended their relationship in early 1992. Soon afterward, T.C. told her mother about the abuse.

On cross-examination, T.C. said that she had not told her mother earlier because she "didn't want anything bad to happen to her." She had talked with a friend about the abuse throughout the time it was occurring because the friend "was experiencing the same thing." She did not report the abuse to "an authority."

### 2. K.S.

K.S. was born in December 1993. She was 28 years old when she testified at trial.

In 1998, K.S.'s mother and defendant began a dating relationship. They married in 2000 or 2001, when K.S. was seven years old. K.S., her mother, an older brother, and defendant lived together in a house in Lancaster.

K.S. testified that she "had a pretty good relationship" with defendant "when [she] was a kid," and considered him her "dad." Their relationship changed one night when she was sleeping on her stomach in bed and awoke to feel defendant on top of her "grinding" his penis against her "butt area." Both of them were clothed. When K.S.'s mother called for defendant, he stopped and left the room. This occurred when K.S. was in kindergarten and about six or seven years old.

3

Similar conduct thereafter "happened repeatedly," "maybe five times a month" over a three or four-year period. The conduct usually took place "on top of [K.S.'s] clothing." Once, however, defendant pulled down K.S.'s pants and rubbed his erect penis on K.S.'s "vagina area" and her "butt area." K.S. was eight years old when this occurred. Another time, defendant engaged in "the same type of gyration," but it ended with defendant ejaculating on her "butt" and "arm." Once, defendant put his hands inside K.S.'s pants and touched her "vagina." Another time, he took K.S.'s hand and put it down his pants until K.S.'s hand touched his penis.

K.S. testified that she did not tell anyone about defendant's sexual abuse as a child because she was "[s]cared of getting in trouble, punished, nobody believing [her]. A lot of things. Losing the relationship with [her] family." She thought that if she said something, defendant might harm her or her mother. She also feared that if others did not believe her she would be "outcasted or something like that." She was also afraid that she would lose her "relationship with the only father [she] knew."

After defendant and K.S.'s mother ended their relationship, defendant married the mother of R.M., another victim of defendant's sexual abuse. K.S. and R.M. became friends. K.S. did not talk to R.M. about defendant's sexual abuse of her. K.S. explained at trial that she thought defendant might have done that to her only, and if she spoke to R.M. about it, R.M. might "look at [her] weird."

In 2012 or 2013, K.S. communicated with defendant through Facebook, and told him: "I never forgot what you did to me." She had no further contact with him.

While attending college in 2017, K.S. spoke to others for the first time about defendant's sexual abuse. Later that year, K.S.'s mother told her that "something happen[ed]" to R.M. K.S. knew she was referring to sexual abuse and told her mother that she believed R.M. "because it happened to me." In August 2017, K.S. reported the matter to law enforcement.

On cross-examination, K.S. admitted that she told an investigating officer that the abuse occurred 10 to 15 times— far less often than her testimony during trial. She also stated that, prior to talking to fellow students in college when she was 23 years old, she had never told anyone in her family, law enforcement, doctors, or nurses about the abuse.

### 3. *C.W.*

C.W. was born in July 1996. She was 26 years old at the time of trial.

K.S.'s maternal grandmother adopted C.W. when C.W. was five years old. C.W. was thus the sister of K.S.'s mother, but two years younger than K.S. Around the year 2000, C.W. visited with K.S. at K.S.'s house about two times each week and sometimes stayed overnight.

C.W. testified to five specific incidents of sexual contact involving defendant. When C.W. was four years old, defendant took her to a bedroom where he laid her on the bed and pulled her pants down. Defendant rubbed his penis "against [her] vagina" for a couple of minutes. When he finished, there was fluid on her "private areas." Defendant told C.W. not to tell anyone, and C.W. felt that if she did, she "would get in trouble."

In the second incident, defendant took C.W. into the backseat of a car parked in defendant's garage, where he rubbed his penis against C.W.'s genitals. A third, similar incident

5

occurred in a bathroom, and a fourth in a closet. The last incident occurred when C.W. was eight years old. As she prepared to go swimming in a pool with other children, defendant took C.W. to his room and started rubbing his penis against her. He stopped when C.W. told him, "No. No. No."

C.W. testified that there were "at least ten" incidents involving defendant rubbing his penis, "skin to skin," against her genitals.

C.W. did not tell anyone about the sexual abuse when she was a child primarily because she "thought [she] would get in trouble." When she was 18 years old, she told her "birth mom," and soon afterward, her adoptive mother. She also spoke with K.S. and R.M. about the incidents. Later, C.W. told a detective who had contacted her in response to K.S.'s report of defendant's abuse toward her.

On cross-examination, C.W. testified that she never told anyone at school or doctors about the incidents.

### 4. *R.M.*

R.M. was born in December 1995. At the time of trial, she was 26 years old.

R.M.'s mother married defendant when R.M. was about seven or eight years old. R.M., her mother, defendant, and R.M.'s three siblings lived together in an apartment in Lancaster. R.M. called defendant, "Dad."

R.M. described five specific instances of sexual abuse by defendant that took place from approximately 2003 until approximately 2008. The first occurred when R.M. was eight years old. R.M. was sitting on defendant's lap as defendant drove a "quad"—a vehicle that is "like a motorcycle, but [with]

6

four wheels." As they rode the quad, R.M. could feel defendant "grinding" his penis against her "butt."

The second occasion occurred when R.M. was sleeping on a couch on her stomach and awoke when defendant was on top of her "grinding his penis area on [her] butt." Both of them were clothed. R.M. got up off the couch and went to her room. Neither said anything to the other.

In the third and fourth instances, defendant took R.M. into his room and rubbed his exposed penis against R.M.'s clothed buttocks until he ejaculated onto her pants.

During the fifth incident, defendant locked R.M. inside a room. He pulled R.M.'s pants and underwear down and rubbed his penis against her genitals.

Defendant committed acts of rubbing his penis against R.M.'s "butt" more than 40 times over the course of about five years and "about 85 [percent] of the time [she] had [her] clothes on." The other times, his penis was exposed and the contact "was skin-to-skin." On other occasions, defendant touched her "vagina" with his fingers. On one occasion, when R.M. was 10 or 11 years old, defendant lifted R.M.'s shirt and sucked on her breasts.

In early 2009, R.M. told her sister's friend about defendant's sexual abuse. She also told her physical education coach. In March 2009, she reported the matter to law enforcement. An investigation ensued that resulted in her and her sisters being placed in foster care. Around this time, she expressed her thoughts in a diary, in which she wrote of wanting "to kill [her]self," to "cut [her]self," and "to die."

About three weeks after reporting the conduct to law enforcement, R.M. told a deputy sheriff that she had "lied about

7

everything." During trial, she testified that she did so because she knew that her report "would not only affect [her], it would affect [her] sister, [her] brother, [her] mom; and [she] didn't want anything to happen to [them]."

### 5. *Monica Borunda (CSAAS expert)*

Monica Borunda is a child forensic interviewer, who testified as an expert regarding CSAAS. She described CSAAS as "a model that helps clinicians understand the way children will respond when they have been sexually abused." She explained that the syndrome has five components. The first is secrecy: The child victim of abuse may want to keep the abuse secret because of express or implied threats of harm to the victim or others, or because of fear of "get[ting] in trouble" or of how family members will react.

The second component is helplessness. A child who is abused by a family member may be confused about the incidents, and not know how to get help or articulate what occurred.

The third component is "entrapment accommodation." The child may learn a variety of strategies for coping with ongoing abuse, including showing affection toward the abuser.

The fourth component is delayed disclosure. It is common, Borunda stated, for persons abused as children not to tell anyone until they are an adult, and to make disclosure incrementally. The victim may also recall more incidents over time. It is also common to have different interviews of the victim yield variations of what occurred.

The fifth component is retraction or recantation. The child may see negative consequences to the family as a result of reporting the conduct and think, "If I take it back, I can undo everything."

8

Lastly, Borunda explained that every child responds differently to abuse and not every child experiences each of the five components.

On cross-examination, Borunda stated that children sometimes falsely assert sexual abuse claims. A child might make a false claim if an adult tells the child to do so, or if the children assert a false claim out of anger directed at the alleged abuser. When the prosecutor asked her about such claims on redirect, Borunda stated that "[t]he statistics put it at around two to ten percent."

## B.    Defense

Defendant testified in his defense and denied any sexual conduct with his accusers. He said that when K.S. was a teenager, she asked defendant to buy her a car. When defendant declined, K.S. became upset. He said he allowed R.M. to sit on his lap when they rode quads to teach her how to drive them. He did not, however, "do anything like mov[e] [his] pelvis against [R.M.'s] buttocks."

## C.    CSAAS Instruction

The court instructed the jury under CALJIC No. 10.64 as follows: "Evidence has been presented to you concerning child sexual abuse accommodation syndrome. This evidence is not received and must not be considered by you as proof that the alleged victim's molestation claim is true. [¶] Child sexual abuse accommodation syndrome research is based upon an approach that is completely different from that which you must take to this case. The syndrome research begins with the assumption that a molestation has occurred, and seeks to describe and explain common reactions of children to that experience. As

9

distinguished from that research approach, you are to presume the defendant innocent.  The People have the burden of proving guilt beyond a reasonable doubt.  [¶] You should consider the evidence concerning the syndrome and its effect only for the limited purpose of showing, if it does, that the alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with her having been molested."

## DISCUSSION

### A.     Admissibility of CSAAS Expert Testimony

Defendant contends that the court erred in allowing Borunda to testify as to CSAAS because such evidence is— or should be—generally inadmissible.  He acknowledges that California courts have consistently approved the use of CSAAS evidence when offered to rehabilitate the credibility of victim-witnesses when the defendant suggests that the witness's conduct after the incident is inconsistent with his or her testimony.  (See, e.g., *People v. Perez* (2010) 182 Cal.App.4th 231, 245; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744; *People v. Bowker* (1988) 203 Cal.App.3d 385, 394 (*Bowker*).)  He further concedes that our Supreme Court in *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*) approved of the use of expert testimony regarding CSAAS.

In *McAlpin*, a nine-year-old child informed her mother that the defendant—a man the mother was dating—sexually molested her.  (*McAlpin, supra,* 53 Cal.3d at pp. 1295–1296.)  The mother, however, did not immediately terminate her relationship with the defendant or report the incident to police.  Law enforcement got involved only after the child reported the incident to school authorities a year later.  During trial, the prosecution

was permitted to introduce "an expert on child molestation investigations," who testified as to why a parent might not report a known child molestation. (*Id.* at p. 1298.) The Supreme Court upheld the admissibility of the testimony in part by relying on decisions approving of the use of CSAAS evidence. (*Id.* at pp. 1300–1301.) "Courts of Appeal," the *McAlpin* court stated, have held that "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; [but] . . . is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident— e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*Id.* at p. 1300.) The court further stated: " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. [¶] The great majority of courts approve such expert rebuttal testimony.' [Citation.]" (*Id.* at p. 1301.) Although CSAAS evidence addresses the behavior of children after being molested, the court applied its rationale to permit "expert testimony" that "dealt with the failure . . . of the child's parent . . . to report the molestation." (*Ibid.*)

Because *McAlpin* involved the use of expert testimony to explain the victim's *parent's* behavior, the court's statements regarding CSAAS are arguably dicta. When, however, the Supreme Court writes approvingly of principles that support its holding, it "does not make much difference" whether the court's statement on the issue has been "elevate[d] . . . to a holding or whether it is a dictum that we must follow"; in either case, "[w]e follow." (*People v. Trice* (1977) 75 Cal.App.3d 984,

11

987; accord, *Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1169.) Indeed, defendant concedes that we have an "obligation to apply *McAlpin* to this case," citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455. He argues, however, that we should "exercise [our] authority to record disagreement with that decision."

We see no reason to depart from the Courts of Appeal who have addressed and upheld, generally, the admissibility of CSAAS evidence or to disagree with the Supreme Court's implicit approval of its use in *McAlpin*. We therefore reject defendant's broad-based challenge to the admissibility of such evidence.

Defendant appears to assert only one challenge to any particular testimony by Borunda. During cross-examination, defense counsel questioned Borunda as to whether children will make false claims about sexual abuse. On redirect, the prosecutor asked Borunda: "[E]arlier you testified . . . about false sexual allegations. And you testified that that's actually very uncommon?" Borunda responded: "Yes. The statistics put it at around two to ten percent." Defendant made no objection to the prosecutor's question or Borunda's response during trial. On appeal, defendant contends that Borunda's "specific quantification, combined with Borunda's assurances to the jury that neither adults nor children falsely report their childhood sexual abuse violated [defendant's] right to due process." The contention is forfeited by the failure to object. Even if Borunda's reference to the statistical probability of a false claim was improper (see *People v. Julian* (2019) 34 Cal.App.5th 878, 886 (*Julian*)), it was harmless. The reference was isolated and brief, and the prosecutor immediately moved on to another subject area. Based on our review of the entire record, there is not a

12

reasonable probability that the outcome would have been different in the absence of the statistical reference. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Lastly, defendant argues that Borunda's testimony regarding CSAAS components of delayed disclosure and recantation "improperly permitted the jury to apply 'the syndrome to the facts of the case and conclude the child was sexually abused.' " (Quoting *Bowker, supra,* 203 Cal.App.3d at p. 393.) Defendant points to the prosecution's closing argument where counsel used Borunda's testimony about CSAAS components to explain the victims' delay in making their disclosures and other behavior. The defendant did not object to the summation during trial and therefore forfeited the argument on appeal. Even if it was preserved for appeal, we do not read the prosecutor's argument as an impermissible attempt to prove that the witnesses were abused *because* they exhibited some of the components of CSAAS; but rather, as a permissible explanation as to how the children's CSAAS-like behavior was "not inconsistent with being sexually abused."

## B. Ineffective Assistance of Counsel

Defendant contends that his trial counsel was constitutionally deficient for failing to object or move to strike Borunda's testimony that "statistics put [the instances of children making false claims of abuse] at around two to ten percent." The claim is without merit.

"To establish a violation of the constitutional right to effective assistance of counsel, a defendant must show that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney, and that counsel's performance was prejudicial in the sense that it 'so undermined

13

the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 783–784 (*Mayfield*), quoting *Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*).)

Even if Borunda's reference to the false claims statistic was improper and might have been stricken if counsel raised the issue (see *Julian*, *supra*, 34 Cal.App.5th at p. 886), counsel may have decided as a tactical matter not to do so because raising it might have served only to draw the jury's attention to the brief statement. Such tactical decisions do not establish counsel's incompetence. (See *People v. Catlin* (2001) 26 Cal.4th 81, 165; *People v. Barnett* (1998) 17 Cal.4th 1044, 1140.)

Defendant has also failed to show that counsel's failure to object was prejudicial. To establish prejudice, defendant is required to " 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Ledesma* (1987) 43 Cal.3d 171, 217–218, quoting *Strickland*, *supra*, 466 U.S. at pp. 693–694.) Defendant makes no such showing here. The comment he complains of is isolated, brief, and in light of the overwhelming evidence of guilt in the record, insignificant. There is no reasonable probability that it had any effect on the outcome in this case. (See *Mayfield*, *supra*, 14 Cal.4th at p. 789; *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 821.) We therefore reject defendant's ineffective assistance argument.

14

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

BENDIX, J.

WEINGART, J.