Filed 4/30/25  P. v. Mix CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAVID MIX,<br><br>    Defendant and Appellant. | A172570<br><br><br>(Riverside County Super. Ct.<br> No. RIF2100970) |

**MEMORANDUM OPINION[1]**

In 2024, a jury convicted defendant David Mix of five felony offenses arising out of his ongoing sexual assault of a minor, his ex-girlfriend's granddaughter, A.B.  At sentencing, the court declined to strike any of Mix's strike prior convictions[2] and sentenced him to 75 years to life plus 5 years and 4 months in state prison.  Mix now appeals, arguing that the trial court improperly admitted evidence of Child Sexual Abuse Accommodation Syndrome (CSAAS) and, in the alternative, Mix was prejudiced by counsel's ineffective assistance in failing to sufficiently object to this evidence.  Mix

---

[1] This case is appropriate for resolution by memorandum opinion because it raises "no substantial issues of law or fact." (Cal. Stds. Jud. Admin., § 8.1; see *People* v. *Garcia* (2002) 97 Cal.App.4th 847.)

[2] Pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).

1

further contends the court erred in declining to strike his prior strike convictions on the basis of remoteness. We disagree with these contentions and affirm.

## BACKGROUND[3]

A.B. met defendant Mix when she moved to her grandmother's house in Perris, California, to attend high school. During the school week, A.B. would live with her grandmother, her grandmother's two adopted daughters, and Mix; on weekends A.B. would return home to live with her mother and stepfather in Riverside. Mix had been in a "past relationship" with A.B.'s grandmother, with whom he had grown up, and was a "grandfather figure" to A.B. and a "father figure" to A.B.'s mother. At the time of trial in 2024, Mix was 61 years old.

One day during her freshman year of high school, when A.B. was 14, she was riding in Mix's car and Mix asked if she was a virgin. When A.B. answered affirmatively, Mix said, "he would be willing to change that." A few months later, on April 20, 2019, Mix took A.B., who was then 15, to a hotel room in San Bernadino or Redlands. Mix asked A.B. if she wanted to have sex and gave her marijuana and vodka. They smoked "two joints" and drank "like, half a pint, maybe"; "foreplay started, and then sex came after that." "Sex" included vaginal intercourse, Mix putting his finger in A.B.'s vagina, and oral sex. A.B. testified the interactions were consensual, "I felt like I was being appreciated." She clarified, "I wouldn't say that I thought that it was okay back then. I kind of still knew that it was bad. I just, I guess, was, like, feeling lonely, and he was making me feel better about myself in that way at the time." A.B. had just moved to a new school, "didn't have any friends,

_____

[3] This summary background is taken from the evidence introduced at trial.

really," and so would spend most of the time at her grandmother's house where "he was always there." A.B. considered Mix to be one of her best friends; she loved him.

For the next year, Mix and A.B. would have some kind of sexual interaction, "between two to four times a week." They would go to different hotels and engage in "the same chain of events"; there was "foreplay, . . . he put his fingers in [A.B.'s] vagina, . . . there was oral sex, and then vaginal intercourse." About half the time, A.B. would perform oral sex on Mix; "most of the time" Mix would perform oral sex on A.B. and put his fingers in her vagina. They would smoke marijuana and drink alcohol, "pretty much every time." A.B. felt like she was "under the influence." These sexual interactions also took place at A.B.'s grandmother's house, in the room her grandmother shared with Mix.

In 2020, A.B. turned 16 and moved back to Riverside; it was during COVID and she engaged in independent studies. The sexual relationship continued at hotels every two weeks and in the living room or A.B.'s bedroom at the Riverside house about once a month. On two separate occasions, Mix started to have anal intercourse with A.B. but stopped "because it hurt." Another time, Mix proposed "a threesome" with one of A.B.'s grandmother's former foster children, A.B. texted the former foster child, whose mother saw the text and "confronted" A.B.'s mom; when A.B.'s mom followed up, A.B. denied any kind of sexual relationship with Mix, as did Mix.

On March 6, 2021, when A.B. was 17, Mix came to the Riverside house to pick up "a part for a car . . . , but he also came to have sex" with A.B. Mix and A.B. "were drinking alcohol and watching [the movie] Training Day, and then . . . had sex after." They stopped because they did not know when A.B.'s parents were going to come home. A.B. did not have any clothes on. Mix

3

began performing oral sex on A.B. again, "and then in the middle of that, my mom walked in the door." A.B.'s mother testified she saw Mix's head between her daughter's legs, "his face was doing something it shouldn't have been doing, too close to my daughter's vagina in the room naked with her. . . . Performing oral sex." A.B.'s mom "starts going ballistic," and Mix repeated, "Oh shit, oh shit" over and over and ran out of the house. A.B.'s mother called 911 while her husband chased Mix. Mix was ultimately detained by police.

When the police came, A.B. did not want to talk to them, told them anything that had happened was consensual, and refused to participate in a medical exam. She testified, "at the time, I didn't want anything bad to happen to him. . . . I just wasn't comfortable, and I felt, like, I was . . . something bad, even though I wasn't. . . . Because I knew that he would get in trouble, and I didn't—at the time, I didn't want him to get in trouble. . . . I cared for him." On March 20, detectives interviewed A.B. again, and this time A.B. told the interviewing officer, "it was really hard to be talking about it. She was forthcoming with information, but I wouldn't say she was, you know, extremely detailed." A.B. said she was "conflicted about whether or not she wanted him to get in trouble" and felt like Mix, "robbed her of her innocence."

At trial, Mix testified that the March 6 incident was "a misunderstanding." Mix had gone to A.B.'s parents' house to pick up some tools. He had talked to A.B.'s stepfather beforehand, knew they were out, and expected them to be home soon. When Mix arrived, A.B. "was acting kind of funny." Mix "decided just to go to the liquor store and go straight back to the house and wait for [A.B.'s stepfather] to get there." Mix backed his car into the driveway, entered the house through the back door, and

4

heard the front door open.  Mix went to the front of the house and testified, "I seen a guy running around the corner."  Mix went back inside the house and asked A.B. who had been there and warned, "I'm going to let [your parents] know what's going on."  Mix then tried to leave but A.B. was "trying to keep me from leaving and begging me not to tell. . . .  [S]he was up on me, and I pushed her off of me."  Mix testified A.B. was "trying to hug on me and saying, please, don't tell.  Please, don't tell.  I'll lose all of my privileges."  A.B. "jumped on" Mix, "trying to hold [him] down."  A.B. had Mix "in a headlock from the front.  She was hugging on me . . . .  She had both her hands around my neck."  A.B. and Mix "tumbled to the bed."  Mix "pushed up off of her, and that's when the front door opened."  A.B.'s mother was right there.  Mix left to look for the person he assumed had been in the room.  Mix tried to run from police because he "was still focused on finding who was in the room."

Mix denied having a sexual relationship with A.B.; he treated her like a granddaughter or a daughter.  Mix and A.B. were "best friends"; A.B. "confided in [Mix] a lot."  Mix was "sort of that special person to [A.B.] because . . . when she got into a fight with her parents, she would give [Mix] a call and sort of vent . . . about what happened."  But A.B. would give him the "cold shoulder" when he tried to talk to her about her alcohol and marijuana use.  Also, there was "friction" whenever he tried to talk to A.B. about the attitude she had with her grandmother and her parents.

Mix testified he would not have had sex with A.B. because he thought she had herpes.[4]  He did not give her drugs or alcohol or take her to any

_____

[4] Mix had previously told the investigating detective he thought A.B. was a virgin and had not mentioned herpes or any sexually transmitted disease.  Nor did Mix explain he was running because he thought someone else had been in the house.

hotels, which would not have been possible because of his work schedule; Mix was a UPS supervisor.[5]

Ultimately, the jury convicted Mix of the five counts charged: (1) oral copulation of a child under the age of 16 (Pen. Code[6] § 287, subd. (b)(2)); (2) sexual intercourse with a child under the age of 16 (§ 261.5, subd. (d)); (3), penetration with a foreign object on a child under the age of 16 (§ 289, subd. (i)); (4) sodomy on a child under the age of 18 (§ 286, subd. (b)(1)); and (5) oral copulation of a child under the age of 18 (§ 287, subd. (b)(1)). Mix admitted his strike prior convictions and waived his right to a jury on the factors alleged in aggravation, which the trial court found to be true.[7] At the subsequent sentencing, the court denied Mix's renewed *Romero* motion,[8] declining to strike any of Mix's strike prior convictions. The court then sentenced Mix to three consecutive terms of 25 years to life on the first three counts, a consecutive mid-term doubled for 4 years on the fourth count, and a consecutive one-third the mid-term for 1 year and 4 months on the fifth count

---

[5] On cross-examination, Mix clarified that he had worked as a Lyft or Uber driver when A.B. lived with him in Perris and set his own schedule. He began working for UPS after A.B. moved back to Riverside and worked the night shift.

[6] Further undesignated statutory references are to the Penal Code.

[7] The aggravating factors included the following California Rules of Court violations: the victim was particularly vulnerable (rule 4.421(a)(3)); defendant took advantage of a position of trust and confidence (rule 4.421(a)(11)); defendant's prior convictions are numerous and increasing in seriousness (rule 4.421(b)(2)); and defendant had a prior prison term (rule 4.421(b)(3).

[8] Prior to being assigned out for trial, Mix had made a *Romero* motion in the calendar department, which the court denied without prejudice.

for a total sentence of 75 years to life plus 5 years and 4 months.  Mix timely appealed.

## DISCUSSION

On appeal, Mix contends the trial court erred in permitting testimony concerning CSAAS and in declining to strike one of Mix's strike priors.  We disagree.

## I.  *CSAAS*

To start, we reject Mix's request that we ignore settled California law and "join the well-reasoned decisions of . . . other jurisdictions and hold that CSAAS evidence is inadmissible for all purposes, or at least for very limited ones."  Mix acknowledges our Supreme Court has held that "CSAAS testimony is necessary to rebut public misconceptions" (citing *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*)), but asserts the Supreme Court "has not directly held that CSAAS evidence is admissible in California."  He distinguishes appellate decisions following *McAlpin* as "wrongly decided" because they are "no longer an accurate reflection of current understandings of how children respond to abuse."  (See, e.g., *People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*) ["While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse"]; *People v. Munch* (2020) 52 Cal.App.5th 464, 472 [declining a similar invitation to reject *McAlpin* and instead concluding "the vast majority of jurisdictions and many of the jurisdictions Munch highlights have rendered decisions that are consistent with *McAlpin*"].)

This blanket assertion made without citation to authority minimizes the growing body of California law that continues to approve the admission of

7

CSAAS testimony when warranted by the particular circumstances of a case. For example, "[e]xpert testimony on CSAAS has long been held admissible in California for the limited purposes of dispelling commonly held myths or misconceptions about child sexual abuse and aiding the jury in 'evaluating the credibility of an alleged child victim of sexual abuse.' " (*People v. Sedano* (2023) 88 Cal.App.5th 474, 479, citing *Lapenias, supra*, 67 Cal.App.5th at p. 171; *McAlpin, supra*, 53 Cal.3d at pp. 1300–1301; *People v. Bowker* (1988) 203 Cal.App.3d 385, 393–394.) Similarly, " '[i]t has long been held that in a judicial proceeding presenting the question whether a child has been sexually molested, CSAAS is admissible evidence for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse.' " (*People v. Flores* (2024) 101 Cal.App.5th 438, 455–456, review den. June 18, 2024, citing *In re S.C.* (2006) 138 Cal.App.4th 396, 418.)

Recognizing our obligation to follow precedent[9] and finding no legal basis to rule differently, particularly here, where the evidence showed years of "consensual" sexual misconduct not reported until witnessed by the victim's mother, we decline Mix's request to hold CSAAS evidence

---

[9] See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ("Under the doctrine of *stare decisis*, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction. Otherwise, the doctrine of *stare decisis* makes no sense. The decisions of this court are binding upon and must be followed by all the state courts of California"); *People v. Ramirez* (2023) 98 Cal.App.5th 175, 216 ("Defendant's references to decisions from other jurisdictions that reached a different position do not affect the binding nature of the *McAlpin* decision").

inadmissible for all purposes and instead turn to Mix's more specific contentions.

## A. *The Trial Court Did Not Err in Its Admission of "Statistical Evidence"*

Allowing for the admissibility of certain CSAAS evidence, Mix asserts error in the admission of what he characterizes as "inadmissible statistical evidence," citing *People v. Julian* (2019) 34 Cal.App.5th 878, 886 (*Julian*) and *People v. Wilson* (2019) 33 Cal.App.5th 559, 568, 570–571 (*Wilson*), which both found error in the courts' admission of statistical probability evidence concerning the veracity of complaining witnesses.

A trial court's decision to admit evidence is reviewed for an abuse of discretion. (*Lapenias*, 67 Cal.App.5th at p. 170, citing *People v. Brooks* (2017) 3 Cal.5th 1, 43.) "An appellate court cannot reverse a judgment based on the erroneous admission of evidence unless the admitted evidence 'resulted in a miscarriage of justice.' " (*Lapenias*, at p. 170; Evid. Code, § 353, subd. (b).) "In a criminal case, a miscarriage of justice can only be found when the reviewing court determines it is reasonably probable that a result more favorable to the defendant would have been reached had the trial court excluded the erroneously admitted evidence." (*Lapenias*, at p. 170, citing *People v. Lazarus* (2015) 238 Cal.App.4th 734, 787, fn. 53 and *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

Here, clinical and forensic psychologist and CSAAS expert Dr. Jody Ward testified that CSAAS is a "pattern of behaviors that many children exhibit who have been sexually abused within an ongoing relationship." Specifically, "children who have been abused within an ongoing relationship, respond very differently than children who have been molested by a stranger." These children "don't tend to report the abuse right away out of love and loyalty toward the abuser." In response to a question from the

9

prosecution about "delayed or nondisclosure," Dr. Ward explained, "[t]he research would say that only a very small minority of people report sexual abuse, at least, to the authorities, that something can be done about it. And then of those who do report, two thirds wait until adulthood to report the sexual assault. So only one third report during childhood, and even within those reporting in childhood, there's a significant delay most of the time."

These general statements that "a very small minority" of people report sexual abuse and "two thirds wait until adulthood . . . only one third report during childhood" are not the kind of statistical probabilities prohibited in *Julian* and *Wilson*, which focused on the veracity of complaining witnesses, thereby invading the province of the jury. The CSAAS expert in *Julian* specifically testified that false allegations by children " 'don't happen very often.' " (*Julian, supra*, 34 Cal.App.5th at p. 885.) Rather, they occur in " 'as low as one percent of cases to a high of maybe 6, 7, 8 percent of cases.' " (*Ibid.*) The Court of Appeal held that where the jury had to decide between the credibility of the complaining witness and the defendant, this "92 to 99 percent probability evidence invited jurors to presume Julian was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case." As such, "[t]his statistical probability evidence deprived Julian of his right to a fair trial." (*Id.* at p. 886.)

Similarly in *Wilson*, the CSAAS expert[10] testified that false allegations of child sexual abuse occur " 'very infrequently or rarely.' " (*Wilson, supra*, 33 Cal.App.5th at p. 568.) He referred to a Canadian study that was "one of the best available" and found sexual assault allegations were determined to be false in " 'about 4% of cases,' " and in none of those cases did the child make

_____

[10] The same expert testified in *Julian* and *Wilson*. (See *Julian, supra*, 34 Cal.App.5th at p. 886; *Wilson, supra*, 33 Cal.App.5th at p. 568.)

10

the false allegations, somebody else had, "such as a parent disputing custody." (*Ibid*.) He also testified that "12 to 15 other studies" found there to be false allegations "in between 1 and 6 percent of the cases." (*Ibid*.) The Court of Appeal concluded this testimony "had the effect of telling the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth," which had the practical result of suggesting to the jury that there was "an overwhelming likelihood" the victims' testimony was truthful. (*Id*. at pp. 570–571.) This testimony therefore "invaded the province of the jury, whose responsibility it is to 'draw the ultimate inferences from the evidence.' " (*Ibid*., citing *People v. Melton* (1988) 44 Cal.3d 713, 744.)

Here, by contrast, Dr. Ward offered no testimony concerning false allegations or the veracity of complaining witnesses, nor did she offer "statistical evidence." She had not met A.B. or Mix, had not reviewed the police report, and testified "just based off of [her] research" on CSAAS. Dr. Ward explained on direct and cross-examination that "[n]ot all children exhibit all of these behaviors" associated with CSAAS, "sometimes there's false allegations," and you cannot use the patterns or behaviors described by CSAAS "to determine whether a report of sexual abuse is true or false." Her reference to "two thirds [of child victims] wait until adulthood" made no conclusions about A.B., who did not report the misconduct; it was discovered by A.B.'s mother who walked in on one assault. As such, there is no error in the admission of Dr. Ward's generalized statements.

But even if one considers the expert's two-thirds and one-third references to be the sort of statistical evidence disapproved of in *Julian* and *Wilson*, any error is harmless. Mix asserts the admission of this improper statistical evidence "amounted to a denial of state and federal due process

11

because it allowed the jury to make the unreasonable inference that, because [A.B.] acted in ways that children who have been molested act, as described by Dr. Ward, she was a credible witness, despite evidence to the contrary." We follow our colleagues' direction in *Julian* and *Wilson*, applying the *Watson* standard[11] and disagree. (*Wilson*, *supra*, 33 Cal.App.5th at p. 572 [" 'The erroneous admission of expert testimony only warrants reversal if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error" ' "].)

Here, there is no reasonable probability that the jury would have reached a different result if the challenged "statistical evidence" was excluded. As stated, Dr. Ward repeatedly testified that not all sexual assault victims will exhibit the patterns of behavior associated with CSAAS. She made no conclusions about A.B. or the circumstances in this case. While the jury could have considered her testimony concerning the tendency of child victims to disclose their abuse long after the fact or not at all in assessing A.B.'s credibility, that was properly within their purview: "CSAAS testimony is permitted ' "to explain the emotional antecedents of abused children's seemingly self-impeaching behavior," ' such as delayed disclosure of the abuse." (*People v. Sedano*, *supra*, 88 Cal.App.5th at p. 479.) "When a victim's credibility is placed at issue due to 'paradoxical behavior, including a delay in reporting,' CSAAS testimony is admissible to disabuse a jury of misconceptions about how a child reacts to molestation." (*People v. Flores*, *supra*, 101 Cal.App.5th at pp. 455–456.)

Further minimizing any chance of prejudice, this jury did not have to evaluate only the testimony of A.B. as compared to that of Mix; they also had the opportunity to consider the testimony of A.B.'s mother who directly

---

[11] *Watson*, *supra*, 46 Cal.2d at page 836.

observed one of the assaults.  Accordingly, "we see no reasonable probability defendant would have achieved a more favorable result in the absence of the challenged testimony."  (*Wilson*, *supra*, 33 Cal.App.5th at p. 572.)

### B. *Counsel Was Not Ineffective.*

In the alternative, Mix argues he was denied his right to effective assistance of counsel under the Sixth and Fourteenth Amendments because defense counsel "failed to specifically articulate that CSAAS evidence is unreliable because it always supports a conclusion that the abuse actually occurred" and did not object to the admission of the allegedly improper statistical evidence at the time it was introduced at trial.  We disagree.

In deciding ineffective assistance, "we determine whether counsel's failure to object fell below the standard required for reasonably competent attorneys and whether counsel's performance was prejudicial to the defendant's case."  (*Julian, supra*, 34 Cal.App.5th at p. 888, citing *Strickland v. Washington* (1984) 466 U.S. 668, 686–692.)  A reviewing court "defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance.  It is particularly difficult to prevail on an *appellate* claim of ineffective assistance.  On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation."  (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Here, we find neither below-standard performance nor prejudice.  Defense counsel appropriately objected to the prosecution's requested introduction of CSAAS evidence in limine, arguing it "invades the province of the jury."  The court granted the People's motion despite this objection; defense counsel had no reason or apparent legal basis to re-raise the objection

13

during Dr. Ward's testimony; and nothing in the record suggests that if defense counsel had specifically argued CSAAS testimony was "unreliable" the court would have ruled differently. (See, e.g., *People v. Anderson* (2001) 25 Cal.4th 543, 587 ["Counsel is not required to proffer futile objections"].)

Turning to Mix's complaint that counsel did not specifically object to the arguably improper "statistical evidence" at the time of its introduction, there remains the preliminary question whether the one-third and two-thirds testimony qualifies as the type of statistical evidence that is impermissible. That said, for the same reasons previously discussed, defense counsel's failure to object did not prejudice Mix, particularly in the context of counsel's targeted cross-examination of Dr. Ward that clarified multiple key points that favored the defense.

For example, during cross-examination, Dr. Ward agreed, CSAAS "is not a tool to determine whether or not abuse occurred." CSAAS instead "gives a laundry list of patterns and behaviors that you would see, you might see, in a sexual abuse situation." But one cannot say, "because these symptoms are here, that means sexual abuse," because "[t]hat would be improper." In response to defense counsel's questioning, Dr. Ward further clarified, "Because any behavior—no behavior, after the fact, can be used to look back and determine whether sexual abuse occurred. That would be improper. If we know that a child has been sexually abused, then these behaviors are helpful in understanding a child's reaction to that abuse. But we can't use them to look back and say, oh, just because they disclosed late or had this or that, therefore, they've been sexually abused. That is improper. That is not accurate." She continued, "there can be patterns that match CSAAS patterns and there can still not be sexual abuse. And sometimes there are also false allegations, even when there are patterns consistent with

14

CSAAS." With these tactical clarifications, defense counsel appropriately limited the jurors' use of the CSAAS testimony in a manner likely more effective than a simple objection. And again, considering the totality of the evidence presented including the direct witness testimony of A.B.'s mother, there is no reasonable probability a differently formulated objection would have resulted in an outcome more favorable to Mix.

## II. *Romero*

The operative amended information alleged 10 strike prior robbery convictions: one from 1985 and nine from 1996. (§ 211.) In considering Mix's *Romero* motion to strike the strike prior convictions, the trial court clarified it had reviewed the filed motions and opposition, as well as the sentencing report prepared by probation and the evidence presented at trial. Neither counsel offered additional argument, leading to the court's ruling: "I believe in order to grant the defense's request and impose a—ultimately impose a determinate term, the court will be required to strike, I believe, nine strikes. The defendant, I believe, has ten strike priors, and nine of them, he was sentenced at the same period of time. I believe it's a period of 28 years, or so, in state prison. [¶] He went to state prison as a relatively young man for a very significant period of time, came out, and then started to, almost immediately, commit the sex offenses in this case. I do think he comes within the spirit of the three strikes law, and I am going to deny the request to strike any of the strikes."

Mix argues the court abused its discretion in denying the *Romero* motion because of the remoteness of Mix's prior convictions: "the strike from 1985 was over 38 years old at the time of sentencing, and the second set from 1996 was over 27 years old at the time of sentencing." Mix argues that "the fact that [Mix's] triggering convictions are non-violent statutory rape offenses

15

. . . is a mitigating factor." He further contends that recent sentencing reforms mean that the definition of "the interests of justice" is changing and evolving, and so should what it means to be "outside the spirit" of the "Three Strikes" law. Because the trial court's decision not to strike any strike priors purportedly "falls outside the bounds of reason" (citing *People v. Giordano* (2007) 42 Cal.4th 644, 663), the sentence should be reversed. We disagree.

We review the trial court's decision not to dismiss a prior conviction under "the deferential abuse of discretion standard." (*People v. Carmony* (2004) 33 Cal.4th 367, 371 (*Carmony*).) Because there is a strong presumption that a sentence conforming to the Three Strikes law is "both rational and proper," a trial court will generally only be found to have abused its discretion in "limited circumstances" such as where the court was unaware of its discretion to dismiss a strike or considered impermissible factors in declining to dismiss. (*Carmony*, at p. 378.)

The Three Strikes law was "intended to restrict courts' discretion in sentencing repeat offenders." (*Romero*, *supra*, 13 Cal.4th at p. 528.) To this end, it " 'does not offer a discretionary sentencing choice, as do other sentencing laws, but establishes a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike, unless the sentencing court "conclud[es] that an exception to the scheme should be made because, for articulable reasons which can withstand scrutiny for abuse, this defendant should be treated as though he actually fell outside the Three Strikes scheme." ' " (*Carmony*, *supra*, 33 Cal.4th at p. 377.)

In determining whether a prior strike conviction should be dismissed, " 'the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects,

16

the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' " (*Carmony*, *supra*, 33 Cal.4th at p. 377.) But the circumstances under which a defendant can be deemed to fall outside the spirit of the Three Strikes law must be "extraordinary." (*Id.* at p. 378.) And in considering these circumstances, " ' " '[a]n appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' " (*Id.* at p. 377.)

Here, no extraordinary circumstances exist, and the court's ruling and the evidence relied on demonstrates its decision was neither arbitrary nor capricious. For his 1985 robbery conviction, Mix was sentenced to 180 days in jail and 3 years of probation, which was extended for a total of 5 years, not terminating until 1990. In 1996, Mix was sentenced to 28 years in state prison in connection with 9 additional robbery convictions. He was paroled in 2015 and discharged from parole in December of 2017. Less than a year later, Mix was living with A.B. and her grandmother, commenting on 14-year-old A.B.'s virginity. In March of 2019, Mix gave A.B. marijuana and alcohol and had sexual intercourse with her for the first time. Mix continued his sexual abuse of A.B. until March 2021, when it was interrupted by A.B.'s mother. Mix then denied the misconduct, explaining he would not have wanted to have sex with A.B., who he thought had herpes, and asserted that any misunderstanding was A.B.'s fault for sneaking another boy into the house. Rather than demonstrate remoteness worthy of being stricken, this timeline demonstrates the notably short period of time between the termination of Mix's parole and his commission of the triggering offenses here. That these offenses were not strikes themselves or do not involve "violence" is of no moment. As such, it was reasonable for the trial court to

17

conclude that Mix did not fall outside the spirit of the Three Strikes law such that any of his 10 prior strike convictions warranted dismissal.

## DISPOSITION

The judgment is affirmed.

_____
DESAUTELS, J.

We concur:


_____
STEWART, P. J.


_____
MILLER, J.


*People v. Mix* (A172570)

19